Glenn A. TYLER, Appellant,

v.

C. A. McDANIEL et al., Appellees.

No. 16439.

Court of Civil Appeals of Texas.

Dallas.

Jan. 8, 1965.

Rehearing Denied Feb. 5, 1965.

Gardere, Akin, Porter & DeHay and George P. Gardere, Dallas, for appellees.

BATEMAN, Justice.

Appellant Glenn A. Tyler sued appellees C. A. McDaniel and L. A. Beecherl, trading as McDaniel and Beecherl Company, to recover damages for personal injury. The Standard Insurance Company intervened to recover sums it had paid to and for Tyler under the Workmen's Compensation Act. The court rendered summary judgment that plaintiff and intervenor take nothing. They both gave notice of appeal but only Tyler perfected his appeal.

A summary judgment is authorized under Rule 166-A, Vernon's Texas Rules of Civil Procedure only when there is no genuine issue of material fact, and the burden of demonstrating the absence of such an issue is upon the movant. Gardner v. Martin, 162 Tex. 156, 345 S.W.2d 274. In determining whether this burden has been carried, the reviewing court must view the evidence in the light most favorable to the party opposing the motion and resolve all doubts as to the existence of a genuine fact issue against the party moving for summary judgment. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929; Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, 562. A careful study of the record in the light of these rules persuades us that the summary judgment was correct and should now be affirmed.

### Facts

Appellant was severely burned when a metal guy wire which he was handling came in contact with a highly charged, uninsulated electric wire overhead. This occurred while appellant was on premises occupied by appellees under an oil and gas lease. Appellant was an employee of Texas Oil Well Service Company. He alleged that he was a member of a four-man crew working for said company in the pulling of tubing and other work on an oil well owned by the

Wm. Brode Mobley, Jr., Corpus Christi, for appellant.

Shafer, Gilliland, Davis, Bunton & McCollum, W. O. Shafer, Odessa, Leachman,

appellees, and that this work was pursuant to a contract between his employer and appellees. Additional facts presented to the trial court at the hearing of the motion for summary judgment are thus summarized in appellant's brief:

"Although appearing to be lengthy in nature, the Appellant desires to set forth for the benefit of the Court, all of the facts at his disposal and to his knowledge. Therefore, the verbatem (*sic*) statements as contained in the Appellant's affidavits, in opposition to Appellee's Motion For Summary Judgment, as well as the paraphrasing of facts to be considered by the Court, will be set forth as fully and as completely as is possible.

"Answers, pursuant to questions asked of Glenn Tyler*, as set forth in Appellee's Motion For Summary Judgment, are that:

"He had been doing well servicing work for something like nine (9) years before this accident happened; that he would consider himself an experienced well servicing man, and he knew just about what it was all about to do work of this kind; that the office of the Texas Oil Well Servicing Company was approximately a quarter mile or a half mile from the McDaniel-Beecherl lease where he was injured. He didn't remember whether he could see the lease from the yard or not, it wasn't too far. He might have seen it, but he didn't know. He knew that he was going to the location about six o'clock on the morning of the accident, which was on June 5th, 1961. He considered Mr. Ed Roberds his boss. He was on a four man crew consisting of Hightower, Frank Hull and Cecil Hull. Hightow-

er and he went in the pulling unit and the Hull boys went in the pick-up truck to the location; that the location was not too far off the road; that while they were standing in front of the office, before going to the well, Mr. Roberds said something about high lines around the well. He remembered that Roberds said that there were high lines at the well, watch it; that he took it to mean that he was to watch out for high lines around this location. He understood that high lines are electric lines and that they were around the location and he was to watch out for them. Mr. Roberds hollered this out as they were leaving the yard and he told the whole crew. He did not remember the exact time of the accident. Hightower backed the truck almost to the well and then they went out to the pick-up truck and changed clothes. They hadn't been on the lease more than thirty minutes or an hour and it hadn't been more than thirty minutes or an hour since Mr. Roberds had told them to watch out for the lines. As they drove on the lease they had to drive under the high lines, under some of them. He saw two (2) that they had to go under. (meaning they had to drive under) As they got out of the truck he could see the high lines; they were not hidden, but he did not remember how close they were to the location. *He knew what the lines were and knew that they were electric lines and knew that they were dangerous and he had known that all of his life. Mr. Hightower did not say anything about the wires after they were on the location, nor did any of the other members of his crew; they did not even talk about them anymore. There wasn't any need to talk about it because they*

* This refers to Tyler's oral deposition taken while he was a patient in a hospital in Galveston. He was attended by his wife and his attorney, and testified that he understood what was being done, was not under any kind of sedative or dope

or anything like that and that his mind was then perfectly clear. His wife then testified by deposition that she had heard her husband's deposition and that his answers were consistent with what he had told her all along about the accident.

*knew they were there, and nobody had to tell him, and nobody had to tell him high lines were dangerous because he knew that.* After arriving at the location, Hightower parked the truck himself and nobody told him where to park the truck. He picked out where to park it himself. Tyler could see where he had parked it; Tyler didn't tell him to move it or anything like that; Tyler said nothing to him about moving the truck. *No one had told Tyler that the electricity had been cut off and as far as he knew it was on."* (Italics ours)

"Glenn Tyler has submitted a sworn affidavit, repudiating the deposition, which was taken in Galveston; that his deposition was made during the time he was undergoing plastic surgery and medication; also, since his injuries, and up to the time that he had given the deposition, he had had very horrible nightmares and hallucinations as a result of the injuries; that he had heard that he had been warned by several people, and that he felt that he *must* have believed at the time of the deposition, that he had received a warning. However, since he is in a more rational state of mind, he recalls that he did not hear any warnings from this dangerous condition that existed at the well, either before going to the site where the accident occurred, or after arriving at the site where the accident happened. He states that the main reason he did not hear any warnings from anyone was due to the fact that he had been hard of hearing since 1949. He went to the Veterans Hospital in Temple by reason of his defect in hearing and was given a hearing aid at that time. He was supposed to have worn it at all times, but didn't on this particular date because it would interfere with his work. At the time of the accident, he did not have it on. Marvin Hightower, who was in charge of the crew, knew that he was hard of hearing. He further states that Mr. Ro-

berds, his boss of the Texas Oil Well Services, in Odessa, Texas, knew that he was hard of hearing, and that the two (2) Hull boys knew that he was hard of hearing; that, therefore, he did not hear any warnings of any kind from anyone the morning of the accident, because he was not wearing his hearing aid at the time. He stated that he knew his work, and knew what he had to do, and no one had to tell him how to do it after he got out on the well site; that because many people had told him that he was warned, he felt that in his own mind he must have heard a warning, but, that it would have been almost impossible for him to have heard any warning, because he did not have his hearing aid on at the time of the accident. He stated further, that it could have been that the reason he did not see the lines was because of the sun coming up in the East, and because of an optical illusion which might have been created. He states further, that it was the first time that he had been on this lease, and the first time he had been around this particular well; that he had no previous knowledge whatsoever of the condition of the well, nor exactly where the high lines were situated around the well, that at no time did anyone tell him that the electrical lines were directly over the well that they were working on, nor did anyone tell him that the lines were not insulated.

"Glenn Tyler's affidavit as to the defect in his hearing is substantiated by a certification by an attending physician, Roland O. Peters, M.D., signed the 2nd day of August, 1949, to the effect that he did have hearing trouble; that it seemed to be getting worse, and that his diagnosis was a ruptured tympanic membrane, middle ear deafness, progressive.

"Glenn Tyler submitted a subsequent affidavit wherein he states that he had been employed by Texas Oil Well Serv-

ices Company since April, 1961, (approximately two (2) months before the accident); that he was instructed to go with the pusher, Marvin Hightower, to the McDaniel-Beecherl lease on the morning in question, at about the time in question, and that they were to pull rods and change a pump on the lease; that the work usually takes three or four hours to complete; that the mast pole was raised, and a cable extended over the end dropping near the ground and the cable is used to pull the rods and do other work on oil wells; that the mast pole is equipped with four (4) guy lines and the guy lines are usually used to secure the pulling unit or truck after the mast pole is raised; that after arriving at the lease, he got out of the pulling unit and walked over to the pick-up truck and changed clothes; that he knew that the first thing to be done was to stabilize the mast pole on the back of the truck; and that this is done by attaching the guy lines to the 'deadmen', which are provided near each well that he has ever worked on, and which are usually placed there on the location at the time the well is completed, for such purposes as this. When he got out of the truck he saw where the 'deadmen' were located, so he put on his gloves and took hold of the guy line, which was to be fastened to the 'deadman' to the West of the well, and was going in that direction when, apparently, as he was walking, the guy line came into contact with an electric line nearby. He said that as he drove upon the lease he saw a line which appeared to be an electric line as he entered the lease; that electric lines such as these are a common site (*sic*) everywhere that he goes; that he paid them no particular attention as to their location above the well or whether or not they were insulated or whether or not they were energized or at the time carrying electricity, and that he could not know the amount of voltage if they

were carrying electricity; that there was nothing to indicate to him that they were any more dangerous than ordinary electric lines which are used all over town; that he did not see any big H frames which support highly electric transmission lines, nor was there indication that these were anything but ordinary electric lines like the ones that are attached to his house, which are insulated and safe to be around; that he was putting on his gloves getting ready to attach the guy line to the 'deadman', the 'deadman' being about thirty (30) to forty (40) feet from the truck; he did not notice, and it was not obvious to him, that the electric lines were almost directly over the well; and even if he had noticed them, he did not notice if they were insulated or not, or whether they were carrying electricity. No one had warned him that in merely attempting to attach a guy line onto the 'deadman' that he would be injured the way that he was; that as he noticed the 'deadman' on the ground, which he was to tie the guy line onto, he assumed that since it was located at that particular place that it would naturally be safe to tie the guy line on to it. That no one warned him that the 'deadman' was in a dangerous place, no one warned him that merely tying a guy line onto the 'deadman' that was placed in the ground for that purpose would be dangerous. He said that in his work he knows that 'deadmen' are used to tie guy lines onto, and knows that simply tying a guy line onto a 'deadman' is not in itself dangerous; that there was nothing to lead him to believe that tying a guy line onto this particular 'deadman' would be any different from tying a guy line onto any 'deadman' in any oil field. And since the 'deadman' was there for that purpose, he naturally assumed that it would be safe to tie it on where it was located; that it never would have occurred to him that the 'deadman' would be placed in such a location that the guy

line that he was carrying could in any way come in contact with an electric line. This was the first time he had ever been on the lease; that he did not know where the 'deadmen' were until he got on the location itself; that he did not notice, nor was it obvious, that the lines were almost directly over the well; that he had only been on the location a few minutes when the accident occurred. He further states that although he did not know it before, or at the time of the accident, that from what he has heard and learned since the accident, that he has never been on, heard of, or seen a lease so arranged where high voltage electric lines are in such proximity to an oil well where work is to be done, nor had he ever seen a 'deadman' located in such a position that a workman had to walk under the electric lines to tie the guy line onto a 'deadman'.

"It is further stipulated by and between the parties hereto that the Appellees, McDaniel and Beecherl, were the owners, operators, and occupiers of the lease, the well, and the electrical lines at the location in question; that the place where the guy wire, which Tyler was carrying, came in contact with the electrical line, was uninsulated; and, it was further stipulated between the parties that a similar accident had happened at the same location approximately ten (10) months prior to the time Tyler was injured, at which time a guy line came in contact with an electrical line and burned the electrical line into *(sic)*.

"For the purpose of showing the warning, the Appellees submitted the affidavit of E. H. Roberds, the employer of Glenn Tyler on the date of the accident and his affidavit is substantially as follows: He stated that he was the general manager and part owner of the Texas Oil Well Services, Inc., and had been such for some period of time prior to the accident; that Glenn A. Tyler was employed by the Texas Oil Well Services on the day of the accident, and had been so employed for some time prior thereto; that he was known to be an experienced oil well service worker and was familiar with the work to be done, and was familiar with the work that was going to be done at the time he received his injury. *He states that he, Roberds, was familiar with this lease and the location of the high lines and electrical lines incident to its operation.* On the morning of the accident, he advised his crew, including Tyler, that the work was to be performed on the lease that day; that the pulling unit would have to be stabilized by tying the guy wires to 'deadmen'; that he warned the entire crew, including Tyler, with reference to the high lines on this particular lease and the dangers incident to the high lines, and instructed them as to the manner in which they could avoid in *(sic)* making contact with the high lines. The crew went to a nearby coffee shop to drink coffee, and, when they returned to the yard to go to the location, Roberds again warned the entire crew to watch out for the high lines and electrical lines. He further states, that all the high lines and electrical lines are plainly visible and it is necessary to drive under one or more of the high lines in order to get to the location to perform the work; that it would be necessary for a man, in effect, to have to hide his eyes in order not to see the high lines and electrical lines at the location. That the high lines are not covered with any type of insulation and is visible to anyone who looks at the lines. That there was ample room on the lease to perform the work that was needed to be done; and that his crew had done work requiring the use of a pulling unit on many occasions prior to the time of the accident; that the 'deadmen' on the lease were adequate to stabilize the pulling unit

and it was not necessary to walk under the lines to attach the lines to the proper 'deadman'. The only way it is possible to make contact with a high line through a guy line is to attempt to attach the guy line to the wrong 'deadman'. If this is done, then it is necessary for the man carrying the guy line to walk directly under the high line which is in absolutely plain sight. (Attention is called to the Court at this point to the Plat of the location in question prepared by an engineer and submitted as an exhibit for the purposes of this appeal. The plat, as certified, shows three (3) 'deadmen' at the location and two (2) of the 'deadmen' being in such a position that were a pulling unit parked in the location, which it was parked by Hightower, it would necessitate a workman walking under the electrical line twice in order to tie guy lines onto the 'deadmen' which were placed on the lease for that purpose. Therefore, the physical facts as shown by the plat are in direct conflict with Roberds statement. The plat shows conclusively that a workman must walk under the electrical lines to reach the right 'deadman'. There is absolutely no other way for the guy lines to be attached to the right 'deadman'.) *Roberds further stated that he fully understood and appreciated the danger incident to the high lines on this particular lease, as well as on any other lease, and knows from common experience that high lines are dangerous. He stated further that he understood, on the occasion of the accident, the electricity had not been cut off and as far as he knew it had never been cut off while they were performing work on the lease prior to the time of the accident.* (Italics ours)

"Mr. E. H. Roberds, signed another affidavit, which is filed in this record, wherein he further stated that, he had warned the crew about the dangerous condition that existed on the McDaniel-Beecherl lease and that he warned them repeatedly because of this dangerous condition. The electric lines, running almost directly over the well which was being worked on, made this well, not only extremely dangerous and hazardous, but it was the most dangerous well, because of the electrical lines, that 'I have ever had a pulling unit working on'. He further stated that he didn't know of any other well more dangerous than this one was at the time Glenn Tyler was injured, and stated further, without question, because of the electrical lines overhead, 'It was the most dangerous and hazardous location that one of my pulling units had ever worked on'. He stated that in pulling tubing or doing other work on the well where Tyler was injured, the electricity would only have had to have been turned off for a few hours. That each time that he had a pulling unit on the well after Glenn Tyler was injured, that McDaniel and Beecherl had insisted that the electricity be turned off in the field; that he either had called the Texas Electric Company to turn off the electricity or McDaniel and Beecherl had instructed him to call the electric company to have the electricity turned off, and, further, that he had never sent a crew on that location since the accident unless the electricity is turned off."

After commenting on what is shown by several photographs and a topographic plat of the lease, the summary of the evidence in appellant's brief continues:

"The extremely dangerous location of this particular well, as alleged in Appellant's First Original Amended Petition, and as is also stated by his employer, Mr. E. H. Roberds, is further substantiated by Mr. Homer Steen. Mr. Steen, by virtue of his affidavit, states that: He is a resident of Odessa, Ector County, Texas, and at the present time works for the Chestnut Well Service and Company, and has worked

for that company for approximately four (4) years. He stated that he had worked for several oil well servicing companies during the last thirty (30) years and has in excess of thirty (30) years experience in working in oil fields, around oil wells, and servicing wells. He states that he is familiar with the McDaniel-Beecherl lease in Odessa, Texas, where the man, who he understands is Glenn Tyler, was injured; that he had worked on this lease several times in the past and that he was aware of its dangerous condition. He states that the electrical wires over some of the wells on this lease make it very dangerous and hazardous. He states that, in fact, 'I would consider it one of the most dangerous and hazardous leases on which I have ever worked. The reason this lease is so dangerous is because of the electrical lines being in such close proximity to the oil wells we work on. I have not worked on a more dangerous lease in my life. This lease was not safe when I worked on it before, and I do not consider it to be safe at the present time. From my experience, it is my opinion that any time work is to be done on wells on this lease that the electrical current should be cut off so that the work could be done more safely'.

"In addition to the fact that this work was ordered by the Appellees, McDaniel and Beecherl, and that the crew, of which Tyler was a member was instructed to go to this lease to do the work for the Appellees, it could be unquestioned that the Appellees knew of the work to be done by virtue of their instructions to the Texas Oil Well Services, Inc., and for the further reason that their assistant pumper, Mr. W. C. Cousins, was present on the lease when the accident occurred. By affidavit submitted by Mr. Cousins, and filed herein, he states substantially that he, too, lives in Odessa, Ector County, Texas, and that on June 5th, 1961, he was employed by the regular pumper of the McDaniel-Beecherl Company as an assistant pumper; that he was working on the lease in Ector County where Glenn Tyler, as an employee of the Texas Oil Well Services Company, was working at the time he was injured. He states further, that he was not at the location when the crew arrived, but, he got there later for the purpose of instructing, assisting and directing them in getting set up, and to get the work started. He states that they were to pull rods and to do other work at this location; that part of his duty was to remain at the job site to assist or direct the activities of the crew, should it be necessary. He states that he was present and working in such capacity at the time Glenn Tyler was injured; that since this was a very dangerous location, he was instructed by Weldon Thompson, the regular pumper for the McDaniel-Beecherl Company, to be present at the job site so 'I could suggest, direct and supervise the work that was to be done. We had been on the location only a very few minutes when the accident occurred.' He states further that he had seen pictures of the location and that the pictures of the location are true and correct reproductions of the location where the injury occurred, and that the injuries to the face of Glenn Tyler were accurate reproductions of the injuries which he had seen, which were sustained by the said Glenn Tyler.

"Mr. Vern Foreman, co-owner of the Foreman Electric Company in Odessa, Texas, also signed an affidavit, which is filed herein; wherein he states that he is the co-owner of the Foreman Electric Company in Odessa, Texas, and that he has been in the electrical business for ten (10) years, having had experience with all phases and types of electricity, lines, transformers, fuses, 'hot wire clamps', and other types of electrical work and experience in his

business, including electrical lines and connections in oil fields and for domestic uses. He states that on August the 3rd, 1960, his company replaced a high power electric line, which had been burned into *(sic)*, on the lease owned and occupied by McDaniel-Beecherl in Odessa, Ector County, Texas. (The Appellees had further stipulated that this accident occurred at approximately the same location where the Appellant was injured) Foreman states that this line is called, and is known as, a distribution line, and that before repairing this line it was necessary to call the Texas Electric Company in Odessa to cut off the electricity on the broken line and the other two (2) lines which extended into the lease on the same pole. That the two (2) remaining lines continued on and were connected to the transformer right in back of the well; that Texas Electric Company sent their man out to turn off the electricity in the field and in particular to turn off the electricity on the line on which they were working. That they (Texas Electric Company) did not charge him any money for turning off the electricity. That this was done by the employee of the Texas Electric Company disconnecting 'hot wire clamps' or 'jumper clamps' which were connected to these three lines. It took the employee from the electric company approximately fifteen (15) minutes to disconnect these 'hot wire clamps' (the 'hot wire clamps' are shown in the pictures which were submitted as exhibits in this cause.) After this had been done, the lines extending into said lease, and in particular, the line upon which they were working which had been burned into *(sic)*, was completely de-energized and safe; that the other two (2) lines which were parallel to the broken line, all being attached to and extending from the same electric pole, were also safe, for the reason that all of the electricity had been cut off; that the re-

pair work on the line could not have been completed unless the electricity had been turned off. He further states that it is a very easy matter to disconnect the 'hot wire clamps' and de-energize the lines and it takes very little time. His total bill for repairing the line that was cut into *(sic)*, was $53.11."

Taking the position that appellant's summary of his own deposition testimony was not quite complete, appellees call our particular attention to the following excerpts from that testimony, which they say was not denied in either of appellant's two subsequent affidavits:

"Q. As you drove up there in the truck, Mr. Tyler, were you driving or Mr. Hightower driving?

"A. Mr. Hightower.

"Q. As you drove up could you see the highline Mr. Roberds had told you about?

"A. Yes, sir. We had to go under them.

"Q. You had to go under them?

"A. Under some of them.

"Q. So you could tell there were high lines there just like Mr. Roberds said?

"A. Yes, sir.

"Q. And you saw some of them, of course, as you went under them?

"A. I seen two we had to go under.

"Q. And then, when you arrived at the location there, you got out of the truck, did you not?

"A. Yes, sir.

"Q. And when you got out of the truck could you see these high lines plain then?

"A. Yes, sir.

"Q. They weren't hidden or anything, were they?

"A. No, sir.

"Q. Were they strung pretty close to the location?

"A. I don't remember how close they was to the location.

"Q. You just remember that you could see them plainly?

"A. Yes, sir. Because we had to go under them, one line.

"Q. And, also, Mr. Tyler, there wasn't any confusion about what they were; you knew what they were?

"A. Yes, sir, I knew what they were.

"Q. You knew they were electric lines?

"A. Yes, sir.

"Q. And you knew that was dangerous?

"A. Yes, sir.

"Q. You have known all your life not to get into high lines?

"A. Yes, sir, I did.

\*   \*   \*   \*   \*   \*

"Q. Did Mr. Hightower say anything else to you about the wires after you got there on the location?

"A. No, sir.

"Q. Did either one of the Hull boys say anything about the wires after you got on the location?

"A. No, sir.

"Q. Did you all talk about them any more?

"A. No.

"Q. There wasn't any need to talk about it Mr. Tyler?

"A. No sir.

"Q. You knew they were there?

"A. Yes, sir.

"Q. And nobody had to tell you?

"A. No, sir. Just outside the office there.

"Q. I say, you didn't have to have anybody tell you they were there; you knew they were there?

"A. Yes, sir.

"Q. And needn't anybody tell you a high line was dangerous, because you knew that?

"A. Yes, sir."

*Opinion*

To recover against appellees the appellant had the burden of showing that they breached some duty which they owed him. They did not owe him a duty to make special preparations for his safety, or to alter the condition of the premises, or to change their methods of operation. Having no right to enter appellees' premises except with their consent, all he had a right to expect was knowledge of conditions to be encountered thereon so that he could make an intelligent choice as to whether the advantage to be gained by entering would justify the incurring of the risks thereof. Harvey v. Seale (Tex.1962), 362 S.W.2d 310. Having decided to enter, he must be held to have subjected himself to the risk of injury from such conditions, provided there were no unknown hidden or latent dangers to entrap him. As to these, there was a duty on the appellees to warn him; but under the law if such an invitee knows of a dangerous condition to be encountered on the premises, and appreciates the danger thereof, there is no duty on the owner to warn him and he is held to have voluntarily exposed himself to the risk thereof and cannot recover. The same result is reached when the danger is so obvious that the invitee must be charged in law with knowledge or appreciation or both. McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391, 394; Halepeska v.

Callihan Interests, Inc. (Tex.1963), 371 S. W.2d 368; Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607; Rittenberry v. Robert E. McKee, General Contractor, Inc., Tex.Civ. App., 337 S.W.2d 197, wr. ref. n. r. e.; Western Auto Supply Co. v. Campbell (Tex.1963), 373 S.W.2d 735.

In his deposition testimony the appellant admitted (1) that prior to going upon appellees' premises he was warned by his employer of the presence of the electrical wires overhead and the danger of coming in contact with them, and (2) that as he entered appellees' premises he saw at least two of the electrical wires, and when he got out of the truck he could see the high lines "plain", as they were not concealed; that he knew the wires he saw were high lines and were dangerous, and he did not need to have anyone tell him they were there because he knew they were there and that they were dangerous.

■ Appellant repudiated part of what he had sworn to in the deposition, and insofar as the contents of his subsequent affidavits differ from what he said on the deposition, a fact issue is presented and that portion of the deposition no longer establishes the absence of a fact issue. As said by our Supreme Court in Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, 562: "If conflicting inferences may be drawn from the deposition and from the affidavit of the same party, a fact issue is presented."

An examination of the foregoing summarization by appellant of his own affidavits discloses that, while he denies therein that he heard the warnings given him by his employer, Mr. Roberds, he does not deny the truth of his deposition testimony to the effect that he did not need to be warned of the presence of the electric high lines as they were in plain view, he saw them and knew they were there, and what they were, and that they were dangerous. (It is common knowledge that such lines are dangerous. McGinty v. Texas Power & Light Co., Tex.Civ.App., 71 S.W.2d 354, wr. ref.)

■ It is our view that under the rules announced in the foregoing cases, the undisputed facts presented to the trial court showed clearly that, regardless of whether he heard the warnings of his employer, the appellant actually had knowledge of the presence of the electrical lines and appreciated the danger of coming in contact with them. That being true, *volenti non fit injuria* is applicable and it must be held that appellees were under no duty to warn appellant of the condition. As said in Halepeska v. Callihan Interests, Inc., supra: "* * * there is no duty to warn a person of things he already knows * * *."

■ But even if we be mistaken in the above, we would in any event be constrained to hold, under the undisputed facts, that if any duty rested upon appellees to warn appellant of the dangers involved in coming on the lease, that duty was discharged. It is apparently the law in Texas that an owner or occupier of property is under a duty to warn the employees of an independent contractor who has undertaken to do work on the property, of hidden or inherent dangers on or in that property, and that such duty is discharged if those in charge of the work for the independent contractor are given warning or have knowledge of the danger. That is the unequivocal holding of the United States Court of Appeals, in Gulf Oil Corp. v. Bivins, 5 Cir., 1960, 276 F.2d 753, 758, cert. den. 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61, followed by the same court in Turner v. West Texas Utilities Co., 290 F.2d 191.

The Texas authorities on this point are few and not entirely harmonious. It had been held in Proctor v. San Antonio Street Railway Co., 1901, 26 Tex.Civ.App., 148, 62 S.W. 938, 939, wr. ref., that the independent contractor owed the duty to warn his employee, but that no such duty rested upon the owner. The Supreme Court in 1924, answering certified questions, announced a contrary rule in Galveston-Houston Electric Ry. Co. v. Reinle, 113 Tex. 456, 258 S.W. 803, 806. However, we do not find this

Reinle case cited in support of this particular holding a single time in the more than forty years since its publication. The duty of an owner or occupier of premises to warn the servant of an independent contractor of hidden or inherent dangers was recognized in Smith v. Henger (1950), 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853, and Roosth & Genecov Production Co. v. White (1953), 152 Tex. 619, 262 S.W.2d 99, but the exact question now before us was not decided in either of those cases. They were followed by Nance Exploration Co. v. Texas Employers' Ins. Ass'n (1957), Tex. Civ.App., 305 S.W.2d 621, wr. ref. n. r. e., cert. den. Flowers v. Nance Exploration Co., 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229, which involved facts quite similar to those of this case. It was held unequivocally that, since the injured workman's superiors knew of the danger, he must be held to have also had knowledge of it.

We are quite well persuaded that, in principle at least, the rule of Bivins and Nance Exploration Company is correct. To hold that an owner or general contractor must warn each individual workman employed by a subcontractor of hidden or inherent dangers in the property, even though those in charge of the work for the subcontractor have full knowledge of such dangers, in our opinion, "would result in imposing a standard of duty exceeding reasonable bounds." Storm v. New York Telephone Co., 270 N. Y. 103, 200 N.E. 659, 662.

It appears without controversy that Tyler's employer E. H. Roberds was thoroughly familiar with the premises, the overhead high lines and all of the dangers thereof. We therefore hold that this knowledge of Roberds was sufficient to discharge any duty resting upon appellees to warn Tyler.

■ Appellant contends that there was a "double duty" resting upon appellees; i. e., a duty not only to take such precautions as a reasonably prudent person would take to protect his invitees from dangers which are not open and obvious, but also to warn them thereof. As we understand this position, it is in practical effect that appellees owed Tyler the "double duty" of having the electricity disconnected *and* of warning him that it had not been disconnected. We are unable to follow this reasoning. Performance of the first alleged duty would clearly eliminate the second, and performance of the second would obviate liability for nonperformance of the first. That these are alternative, rather than double, duties is clearly held in Western Auto Supply Co. v. Campbell (Tex.1963), 373 S.W.2d 735, 736, and announced in Restatement of the Law of Torts, Sec. 343.

Tyler admitted knowing of the dangerous high lines extending across the lease, also that there was no need to warn him of what he already knew. This, then, leaves the sole question: Was there a duty on appellees to exercise any degree of care to protect Tyler from the danger of bringing the guy line he was carrying into contact with one of the high lines? We think not. Tyler admitted that, as far as he knew, the electricity was "on" when he began his work under the lines. As said in Moore v. Texas Company, Tex.Civ.App., 299 S.W.2d 401, 403, wr. ref. n. r. e., "The appellee was under no duty to warn appellant of any transitory dangers arising during the performance of the work. The owner of the premises is under no duty to the employee of an independent contractor to see to it that the work is done safely. * * * Union Tank & Supply Co. v. Kelley, 5 Cir., 167 F.2d 811, 815."

■ Therefore, whether appellant's injuries be considered as arising from an unsafe condition of the premises or from the manner of the performance of the work, they cannot be said to have arisen from a breach of any duty owed to him by appellees. The appellees have carried the burden of showing that there was no genuine issue of material fact in this case, and the summary judgment in their favor is therefore

Affirmed.