Richard Dean HOPKINS, Appellant,

v.

TEXAS POWER AND LIGHT COMPANY et al., Appellees.

No. 18346.

Court of Civil Appeals of Texas, Dallas.

Sept. 5, 1974.

Rehearing Denied Oct. 10, 1974.

Harold J. Eisenman, Waldman & Smallwood, Beaumont, for appellant.

Gordon H. Rowe, Jr., Gardere, Porter & DeHay, L. W. Anderson, Anderson, Henley, Shields, Bradford & Pritchard, J. Dan Bohannan, Burford, Ryburn & Ford, Dallas, for appellees.

BATEMAN, Justice.

This is a common law damage suit for personal injuries sustained by appellant

Richard Dean Hopkins, a painting subcontractor who was working on a portion of the shopping center known as the Irving Mall. Hopkins appeals from a take-nothing summary judgment rendered in favor of the three defendants, Texas Power and Light Company, Rob-Roy Electric, Inc. and Childs Construction Co.

Our problem is to determine whether the undisputed summary-judgment evidence, viewed in the light most favorable to Hopkins, showed as a matter of law that none of the defendants breached any duty of care owing by it to Hopkins, resulting in his injuries, and whether the doctrine of *volenti non fit injuria* applies. Our examination of the summary-judgment evidence, and particularly the deposition of the plaintiff Hopkins, compels us to hold that on the occasion in question he was, as to each of the defendants, a trespasser, or at most a mere licensee; and that he knew and appreciated the danger confronting him and voluntarily assumed the risk thereof.

Hopkins was self-employed, being a partner with his brother in the commercial painting business, having had about fourteen years experience therein. His work is that of a field superintendent over several employees. The job on which he was working on the occasion in question is known as the Penney Card Shop. Luther Hill and Associates had the contract to build that particular area in the Mall, and Hopkins and his brother had the painting subcontract under Luther Hill and Associates to paint the walls and ceiling of the Penney Card Shop.

Appellee Childs Construction Company ("Childs") was the general contractor for the mall section only, having no responsibility for providing electric lighting or power, either temporary or permanent service, in the individual leased areas, such as the Card Shop. Childs' only responsibilities concerning such individual areas were to pour the concrete floors, install sprinkler systems, build outside and back walls, install the electric "disconnect" at the top of each meter box and pull the electric wires up to the individual leased premises. Childs' responsibilities stopped at the leased premises, and the individual tenants had the responsibility for wiring within the shops themselves.

Appellee Rob-Roy Electric, Inc. ("Rob-Roy") had the contract to do the electrical work for the mall generally, not including the individual leases. It had no responsibility for anything inside the Penney Card Shop except to get the wires to the shop itself. Rob-Roy pulled the wires inside the back of the Shop, and after peeling the insulation from the ends of the wires, twisted the bare wires together to inform any other electrician that the wires were not "hot."

Appellee Texas Power and Light Company ("TP&L") installed the individual meters and supplied electric current. The individual tenants had the responsibility of arranging with TP&L for individual meters and electric service. No request had been made to TP&L for electric service to the Penney Card Shop. All of Rob-Roy's work had been finished and inspected and approved by the City Inspector, but the wiring inside the Card Shop had not been completed or inspected, so no meter could have been installed for the Penney Card Shop prior to the date of the accident.

Hopkins was painting inside the Card Shop on Monday, July 5, 1971, a holiday. Since he was working in a leased area, the general contractor, (Childs) had no right to deny him access, and its permission to work in the leased area on a holiday was not required. Hopkins and his employees had electric lights in the Shop that morning, but they went off at about 1:30 p. m. The power for these lights came from a temporary service line which ran through the Shop. Hopkins left the Shop area in search for a source of power. He met Childs' watchman, Smith, who at Hopkins' request took him to two different meter closets, the second one having in it a box

marked "Penney Cards." This was approximately 150 feet from the Card Shop. Smith did not tell Hopkins to do anything, or not to do anything, but simply showed him the meter closet. The closet area was well lighted.

Hopkins opened the door of the closet and found therein four "disconnect" boxes, each having a meter box directly under it. Three of these had meters installed in them, and the disconnect boxes above them had levers pushed in the upward or "on" position. The box marked "Penney Cards" had no meter installed in it but had a metal disc over the place where the meter would eventually be placed. The lever of the disconnect box above that meter box was in the down or "off" position. Hopkins flipped that lever up to the "on" position within three or four seconds after opening the meter closet. This did not produce any discernible effect, so he opened the meter box that had the metal disc on it. He testified by deposition that he was "bound to have" seen all four installations when he opened the closet but did not pay any attention as to whether the other three had meters installed in them, that if he had paid any attention he would have seen that the others had meters. After he opened the lower box he saw a switch which he also turned to the "on" position, whereupon the box suddenly "exploded" in his face. For reasons of safety, this switch is constructed so that it cannot be turned to the "on" position when the meter box door is closed. Only fifteen or twenty seconds elapsed from the time he opened the closet door until he flipped the switch inside the meter box. Hopkins received burns on his face, neck and hand, and was off work for one month.

Hopkins made numerous admissions in his deposition which show quite definitely that he was not an invitee, as he alleged, but was a trespasser, or at most a licensee. He testified that all electric lines should be considered as being "hot"; that he knew that the switch is "off" when in the down position and "on" when in the up position;

that he knew that he should not turn a switch "on" without further checking to see why it was in the "off" position; that he knew the switch on the Penney Card Box was in the "off" position; that he knew the difference between temporary and permanent service; that he knew he should not open or close a meter box that does not have the meter installed; that he knew he should not turn a switch "on" where there is no meter without first checking it out; that he knew he should first check to see if the power is on and whether there is a shortage because electricity is dangerous; that he knew there should have been a meter before one could lawfully get electricity; that he knew electricity can hurt or kill; that he knew there was no permanent service to the Penney Card Shop, and that flipping the switch called for the exercise of care on his part since it involved electricity; that he knew that going into the meter closet area could be dangerous and that he took the risk of danger when he began flipping the switches; that he knew that the meter area was incomplete and still under construction.

Hopkins had never attempted to locate the source of power which provided the electric lighting for the Card Shop, and never tried to call Luther Hill, either about the source of power or about how to rectify his problem when the lights went out. He did not even ask the watchman or anyone else why the power had gone off in the Shop, and made no inspection himself to determine why it was off. He flipped the first switch immediately after opening the closet door because he thought someone had turned it off; he thought this simply because the switch was in the "off" position. Yet, although the watchman was standing just back of him, he did not ask the watchman whether he or someone else had turned the switch off and did not even look at the other three meter boxes or pay any attention to whether they had meters installed in them, although if he had paid any attention he could have seen that they did and that the "Penney Cards" box did

not. He admitted he did not know what the switch inside the meter box was for, and that he did not look at the "Danger— High Voltage" sign on the meter bank. He did not check out the effect of flipping the switches before he flipped them and did not even know what was in the lower box. Hopkins testified further that his only real concern was getting lights to the Card Shop, that he was losing money because he was having to pay his employees time and a half for working on a holiday.

An employee of TP&L testified that TP&L places metal wire seals on its meter boxes and that he placed one on the "Penney Cards" meter box, making it impossible to turn the switch inside the box without first cutting the seal with pliers and opening the box; that the seal was on the "Penney Cards" meter box on July 2, 1971, which was a Friday and the last business day prior to the accident on the following Monday, July 5. Hopkins testified, however, that no such seal was on the box when he opened it. We accept his testimony as true in reviewing the summary judgment.

The watchman, Smith, who took Hopkins to the meter closet, was employed by Childs and received no instructions whatever from either of the other defendants. He expressed doubt that Hopkins would ever have found the meter closet without his directions since there were no markings on the door. Rob-Roy had instructed Childs to keep everyone away from the meter closets, and Childs had instructed its watchman Smith not to allow anyone to "mess with" the electrical outlets. Hopkins had never been to the meter closet area before, as it was out of the normal flow of traffic in the Mall. Hopkins admitted that the lighting was no part of his job, his job being confined solely to painting within the Penney Card Shop.

It is well settled that the only duty owed a licensee or trespasser is not to injure him wilfully, wantonly or through gross negligence, and that it is only in the case of an invitee that there is a duty to exercise ordinary care. State v. Tennison, 509 S.W.2d 560, 562 (Tex.1974); Burton Construction & Shipbuilding Co. v. Broussard, 154 Tex. 50, 273 S.W.2d 598, 602–603 (1954); Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 615 (1950); Carlisle v. J. Weingarten, Inc., 137 Tex. 220, 152 S.W.2d 1073, 1074 (1941); 40 Tex.Jur.2d Negligence § 64 at 548–50 (1962). It is sometimes held that a further duty is owed to licensees; i. e., to refrain from injuring a licensee by "active negligence." 40 Tex.Jur.2d Negligence § 68 at 553, citing Burton Construction & Shipbuilding Co. v. Broussard, *supra,* and Houston Belt and Terminal Ry. v. O'Leary, 136 S.W. 601 (Tex.Civ.App.—Galveston 1911, writ ref'd). In the case at bar, however, the only acts of negligence alleged were acts allegedly left undone, not acts done. No active negligence was alleged, and the summary-judgment evidence established that none of the defendants was guilty of any such active negligence. *See* Texas Pacific Coal & Oil Co. v. Bridges, 110 S.W.2d 1248, 1251 (Tex.Civ.App.—Eastland 1937, writ dism'd).

In our opinion each of the defendants has shown, as a matter of law, that Hopkins was not a business invitee of either of them, but was a trespasser, or at most a licensee, as to each of them. In determining whether one is an "invitee," or "licensee" the test generally applied is whether he had present business relations with the owner or occupier of the premises which would render his presence of mutual aid to both, or at least to the benefit of the owner, or whether his presence there was for his own convenience, or on business with others than the owner or occupier, and, in the absence of some relation inuring to the mutual benefit of both, or to that of the owner, he is no more than a licensee. Cowart v. Meeks, 131 Tex. 36, 111 S.W.2d 1105, 1107 (1938). It was shown by the summary-judgment evidence, without dispute, that no such relation existed between Hopkins and either of the defend-

ants. If he was an invitee of anyone, it would have been of Luther Hill and Associates or Penney Card Shop and neither of them was sued.

Hopkins argues that he was an implied invitee of appellee Childs when injured, since Childs occupied and controlled all the premises and Hopkins was there for a business purpose, citing Hernandez v. Heldenfels, 374 S.W.2d 196 (Tex.1963). This case is not in point for there the plaintiff was injured while on a portion of the owner's premises where he had a right to be and, in fact, "was walking on the roadway where his superior told him to walk." No one told or invited Hopkins to go where he went or to do what he did when he got there.

 Moreover, a person may be an invitee as to certain parts of the premises of the owner or occupier, but not as to other parts, and when he leaves that part of the premises to which he has been invited and enters upon another part, his status is immediately changed from that of invitee to that of a trespasser or mere licensee. "It is only where it appears that the victim sustained the injury while using a part of the premises that was designed for his accommodation or use that the owner or occupant may be held liable." 40 Tex.Jur.2d Negligence § 63 at 546–47 (1962). In Burton Construction & Shipbuilding Co. v. Broussard, *supra*, 273 S.W.2d at 602, it was said that "A person may be an invitee as to certain parts of the premises but not as to others." *See also* Pogue v. Allright, Inc., 375 S.W.2d 533 (Tex.Civ.App.—Austin 1964, writ ref'd n. r. e.), and Mendez v. Knights of Columbus Hall, 431 S.W.2d 29 (Tex.Civ.App.—San Antonio 1968, no writ), and M. N. Bleich & Co. v. Emmett, 295 S.W. 223 (Tex.Civ.App.—Galveston 1927, no writ).

We hold that the undisputed evidence showed as a matter of law that neither defendant breached any duty owing to plaintiff.

 Our supreme court in J. & W. Corporation v. Ball, 414 S.W.2d 143, 146 (Tex.1967), set forth the essential elements of the *volenti* defense as follows:

> The requirements for such a defense are (1) the plaintiff has knowledge of facts constituting a dangerous condition or activity; (2) he knows the condition or activity is dangerous; (3) he appreciates the nature or extent of the danger; and (4) he voluntarily exposes himself to this danger.

It clearly appears from Hopkins' own testimony that each element of *volenti* was present. *See* Tyler v. McDaniel, 386 S.W.2d 552, 562 (Tex.Civ.App.—Dallas 1965, writ ref'd n. r. e.).

The foregoing holdings make it unnecessary for us to pass upon the question of whether Hopkins was shown by the undisputed evidence to have been guilty of contributory negligence as a matter of law.

The judgment is affirmed.

GUITTARD, J., not sitting.