236

Jimmie G. PEMBROOK, Appellant,

v.

PHILLIPS PETROLEUM COMPANY,
Appellee.

No. 4378.

Court of Civil Appeals of Texas,
Eastland.

Jan. 22, 1971.

Rehearing Denied Feb. 19, 1971.

Jack Hazlewood, Underwood, Wilson, Sutton, Heare & Berry, R. A. Wilson, Amarillo, for appellant.

C. J. Roberts and Bob D. Slough, Amarillo, for appellee.

COLLINGS, Justice.

Jimmie G. Pembrook brought suit against Phillips Petroleum Company to recover damages for injuries sustained because of a fire which ignited when a large earth moving machine operated by him struck and broke pipelines owned by the defendant. Plaintiff alleged that he was employed by a subcontractor in remodeling the Hutchinson County Municipal Airport and had just commenced to build an access road to the job site when the pipelines were struck by the heavy machine he was operating. The defendant filed a motion for summary judgment asserting that there was no genuine issue of fact upon which defendant's duty to avoid contact between

its pipelines and the heavy equipment operated by plaintiff could be predicated. The motion of defendant Phillips Petroleum Company for summary judgment was granted and Jimmie G. Pembrook has appealed.

Appellant Pembrook relies upon one point contending that the court erred in granting Phillips' motion for summary judgment. It is conceded that there is a fact issue on the question of damages. Appellant asserts however, that the pleadings, depositions and affidavits present triable disputed material issues of fact on the question of appellee's liability. He contends there is a triable issue of fact in each of the following particulars and that Phillips was negligent (A) in failing to post suitable warnings to persons approaching the high pressure gasoline line above the surface; (B) in failing to bury the high pressure gasoline line a reasonable depth below the surface of the soil; (C) in failing to keep the area around the pipe where it was aboveground free from foliage and vegetation; (D) in failing to bury the line below plow depth; that Phillips was negligent; (E) in failing to warn those persons and firms, including the plaintiff, involved in the performance of the construction contract that the pipelines in question were misleadingly represented as to their actual location by the contract maps; (F) in failing to notify those persons and firms, including the plaintiff, involved in the performance of the construction contract, first as to the true location of the underground pipeline in question, and second, that the lines were aboveground at the point in question; and that if B. G. Glenn's knowledge of the pipeline in question and its location and the fact that it was above ground obliterates any duty otherwise owed by Phillips, which appellant Pembrook does not concede, nevertheless, (G) there is an issue of fact as to whether B. G. Glenn was aware of the danger posed by the pipeline both as to its location and as to its position above the surface of the soil, obscured by foliage and vegetation.

Appellee Phillips Petroleum Company contends that under the pleadings and summary judgment proof it had no duty to take any measure other than those it had already taken to prevent the contact with its lines and that the summary judgment was therefore properly granted. We agree with appellee's contention. The facts and circumstances of the case, including its background are extensive and complicated, and are substantially as hereinafter set out. As noted there are some conflicts in the evidence, but the facts material to the judgment appealed from are undisputed.

■ Phillips acquired pipeline rights-of-way in 1943 and 1944 for the 3″ and 6″ pipelines in the Mary Whitley Survey where the accident in question occurred. These rights-of-way, along with many others, were obtained from the Whittenburg estate covering ranch land and such grants covered land almost adjacent to the Phillips Refinery and liquid processing center at Phillips, Texas. The terrain is rough and filled with canyons and ravines. It is short grass country and contains many oil wells. The surface of the land is still owned and being operated by the Whittenburgs. The grants to Phillips provided that pipelines would be buried below plow depth. However, it is undisputed that the Whittenburgs knowingly permitted Phillips to maintain the pipelines above the ground at certain places for over 20 years and never objected thereto or asked that such lines be buried. An instance where the pipelines were not buried was at the site of the accident here in question. An old abandoned fill-in oil well pit lay in the path of the 3″ and 6″ pipeline easements so that Phillips, when it laid the lines in 1944, constructed such lines over the pit on "A" frames. On each side of the pit the pipelines were returned into the ground. The pipelines were placed on the "A" frames because of the corrosive nature of the soil in the old filled-in pit. Roy Whittenburg stated that if the time ever came when the estate needed any of the

lines to be buried which were not already buried, the estate would exercise its right to require it. He stated, however, that no request had ever been made to Phillips to bury the two pipelines and that such lines were in "good standing" until such time as the Whittenburgs objected. We overrule appellant's contention that Phillips was negligent in failing to bury the line below plow depth. The provision in the lease from the Whittenburgs that the pipelines would be buried below plow depth was made to protect possible future cultivation by the Whittenburgs and was for their benefit. The evidence shows conclusively that neither the Whittenburgs nor the county, who bought a portion of the land for airport purposes, ever objected to Phillips' failure to so bury the lines. Phillips was not guilty of a breach of duty because of such failure.

In 1949 the Whittenburgs sold a parcel of the land out of the Mary Whitley survey to the County of Hutchinson for the construction of a municipal airport near Borger. The conveyance included the area where the 3″ and 6″ pipelines rested on the "A" frames across the old slush pit. The airport was built during the year 1950. Prior to the final construction of the runways, which necessitated the filling of ravines and canyons to form a flat mesa above the surrounding hills, the 3″ and 6″ pipelines in question along with several other lines of various types were gathered into a common encasement where such lines crossed the runways. The county did not encase such lines all the way across its property but only for a distance necessary to accommodate the runways. On both the east and west sides of the main runway the nine lines including the 3″ and 6″ lines, in leaving the corridor or encasement, were fanned out to their original locations.

By 1951 the airport was completed. It had a north-south paved runway and an east-west sod runway. The county left the lines undisturbed at a point about 700 feet east of the main airport runway upon the mesa. The work of taking up the old lines was done by Claude Robinson, a contractor for the county. There is a sharp drop in elevation from the mesa level through the canyon country to the "A" frames. The "A" frames upon which the pipelines in question rest are about 150 feet west of the east boundary line of the airport property which is marked by a fence and a county road. Signs on the fence straightaway from the pipelines on the "A" frames state: "CAUTION— HIGH PRESSURE PIPELINES—PHILLIPS PETROLEUM COMPANY." Warning signs over the other lines are situated in the east fence.

The Commissioners Court of Hutchinson County was in control of the airport property and was aware of the pipelines on the "A" frames for many years prior to the 1965 construction. It is undisputed that all times since the county acquired the property in 1949 the pipelines were above ground on the "A" frames with the knowledge and assent of such county officials. The county made no use of the property below the airport mesa where the pipelines were on the "A" frames.

In 1965 the county began a project to improve and enlarge its airport. The north-south runway was to be lengthened at the north end. The other runway was to be paved and additional improvements made. On March 7, 1965 the county entered into a contract with Municipal and Plant Engineers, Inc. of Borger, Texas to provide the required professional engineering service and supervise the construction. G. C. Bennett was the principal employee for Municipal and Plant Engineers.

The depositions of Bennett show, and it is undisputed that in preparing his plans and specifications Bennett contacted Phillips about its pipelines. He requested a meeting with some member of Phillips' Engineering Department, and K. D. Ehlers was designated by Phillips. Bennett was not an employee of Phillips in preparing the plans and specifications for the airport.

He and Municipal and Plant Engineers prepared the plans for the county. It is undisputed that Bennett was also in charge of all construction under such plans.

Phillips was concerned with the manner in which its pipelines would be affected and the action to be taken to avoid their contact with the construction work. Bennett stated that Ehlers, Phillips' representative, assisted him in any way that he could to make sure that Municipal and Plant Engineers got all the information needed. Bennett was furnished the resurvey plats of the nine lines through the encasement under the runway at the south end of the airport, including the 3″ and 6″ gasoline line. Such resurvey plats for the lines in question show that the lines are above-ground on "A" frames in the exact place where it is undisputed that they are.

Bennett's final plans were completed in August 1965. He divided the work to be done by the contractors in phases. Phase I limited the area in which the contractors were initially allowed to work. The record shows that this was done in consideration of airport safety, and that there were pipelines all over the airport which Bennett had not located and marked as he had those lines in the work area of Phase I.

Bennett's plans show no access road. He stated that this was a matter for the contractor to consider. The airport already had two entrances for ingress and egress, one at the north end and the other was by the administration building on the west side. A county road almost entirely encircled the airport property. Kansas Earth Movers used the road by the administration building to move in their equipment on the afternoon of September 30, 1965. The subject of an access or service road for the contractors arose about a week or more prior to the beginning of the construction. The Federal Aviation Agency questioned Bennett about the matter. Griffin, the airport manager, and Bennett drove over the airport looking for a suitable route. Several routes were considered. The interested parties includ-

ing Popejoy, Kansas Earth Movers, Griffin and Bennett agreed that the road would be built at the east side location which ran on the north side of and near the pipelines on the "A" frames.

The record shows and it is undisputed that Bennett told Glenn, the superintendent of Kansas Earth Movers, to walk out the path of the proposed access road and to look for pipelines. Bennett stated that the contractor brought his equipment and employees, including appellant, Jimmie G. Pembrook, onto the airport premises on the afternoon of September 30th, the day prior to the accident. He stated that he discussed the matter with Kansas Earth Movers supervisory personnel, either Mr. Vesper or Mr. Glenn, and it was decided that on the following day they would "strip the extension on runway 21" but that they wouldn't "do any cutting" because of a pipeline that had not been accounted for in that area.

The construction of the access road began the day after Kansas Earth Movers arrived. Vesper was the owner of the company, and it is undisputed that Glenn was his superintendent. Pembrook was one of the heavy equipment operators. Glenn was Pembrook's supervisor and gave Pembrook his orders. Prior to the start of the road construction Glenn talked to Bennett and asked permission to begin construction of the road. A large tandem earth moving machine was to be used to level the surface and scrape off vegetation, cutting no more than 3 to 4 inches deep. The machine was a self-propelled scraper weighing 93,600 pounds. It was 11 feet high, 13 feet wide and 63 feet long. A motor was in both front and back. The reason Glenn asked Bennett for permission to use the large earth moving machine to build the access road was because the area was outside the work area staked for Phase I. It is undisputed that Bennett had not accounted for the pipelines in that area as he had the staked area. His plat as to the airport beyond the work area did not show all the data reflected on the resurvey plat furnish-

ed him by Phillips, such as the "A" frames carrying pipes above ground. He informed Glenn that the large earth moving machine could be moved into the area to build the access road provided Glenn would first walk out and look for pipelines ahead of the machine. This statement was not controverted.

Glenn, the superintendent of the project for Kansas Earth Movers, was a civil engineer. He stated in his depositions that on the day of the accident he was in complete charge. Concerning the instruction to him by Bennett to walk out the route of the access road and look for pipelines, he stated that he was aware he should walk out the route on the afternoon of September 30th, and on that afternoon he did walk out the route; that on the following day he walked only a part of the way with Pembrook to a point where he thought Pembrook could see the lines. Pembrook denied being shown the lines by Glenn. Glenn testified that he could see the lines at such point. Glenn stated that he saw the vegetation and the two pipelines on the afternoon of September 30th when he walked out the path of the two lines, which he said, "I was to be sure I didn't hit." Glenn stated that after he discovered the exposed pipelines on the "A" frames and had planned the route for the road to cross these lines to the east of the place where they were exposed, he revisited the area a second time on the same afternoon; that he probed for cover over the two lines beyond the point where they entered the ground on the east side of the "A" frames to establish adequate support over such lines for their equipment. He said that he set stakes where the lines were to be crossed by the road on the east side of the "A" frames.

We agree with appellant's contention, in effect, that the question presented in this appeal is not whether there was evidence to support the judgment, but is whether a consideration of the pleadings, depositions and affidavits show there is no issue of fact for the trial of facts, and that Phillips is entitled to judgment as a matter of law.

In determining this question every intendment reasonably deducible from the evidence and record must be indulged in favor of appellant. Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93 (1954).

The record does show a dispute between the parties concerning the knowledge of Pembrook and Vesper of the location of the pipelines in question on the "A" frames, and the existence and adequacy of Glenn's warning to Pembrook. We are of the opinion, however, that the record and the undisputed summary judgment proof shows that Glenn, the supervisor in charge of building the road for the contractor who employed appellant Pembrook, knew about the existence of the pipelines on the "A" frames, and fully appreciated the danger to appellant.

Bennett instructed Glenn to walk out the path of the proposed road and look for pipelines. Since Glenn was warned about investigating the pipelines by walking over the path of the proposed road and was warned to look for the dangerous conditions complained of, Glenn had knowledge that placed upon him the burden of avoiding contact with the pipelines which were aboveground. Glenn stated, and it is undisputed, that he did walk out the path of the proposed road and that he did find the lines on the "A" frames.

Appellant claims to have been an invitee of Hutchinson County, the owner of the airport. As invitees of Hutchinson County, the contractor and its employees stood in the same position as the county with respect to the legal relationship between the owners of the dominant and servient estates. With full knowledge that the Phillips pipelines were in place aboveground on "A" frames and had been for many years and that many other pipelines were in the way of the construction contract, the county officials delegated to Plant Engineers the duty of the county to warn its invitees of the existence and condition of such pipelines. Bennett was the representative of Municipal and Plant Engineers. He and

Griffin, manager of the airport, selected the route of the access road for the construction contract. Bennett had resurvey plats showing this information. It was under these undisputed circumstances that Bennett, the supervisor of the project, told Glenn, supervisor for the invitee construction company, to walk out the path of the proposed road and look for pipelines before entering the area with the large machine which appellant operated. As heretofore indicated, Glenn stated that he knew the lines were there. It is thus established and is undisputed that Glenn was aware of and appreciated the dangerous condition which resulted in appellant's injury. Appellant's contention to the contrary is overruled.

Appellant's contention that there is a conflict in the summary judgment proof concerning Glenn's knowledge and appreciation of the danger involved is based upon affidavits by Pembrook and Vesper. The affidavits of Pembrook and Vesper amount to no more than opinions and conclusions and are not sufficient to raise an issue of fact on the question. U. S. Fidelity and Guaranty Company v. Henderson, 52 S.W. 2d 811 (Tex.Civ.App., 1932 no writ hist.). Kuper v. Schmidt, 161 Tex. 189, 338 S.W.2d 948 (1960).

In Delhi-Taylor Oil Corporation v. Henry, 416 S.W.2d 390 (Tex.Sup.1967) it was held that the duty to warn an invitee of hidden dangers on the premises is discharged by knowledge and appreciation of the danger by the invitee's employer or supervisor. In discussing this question the court stated as follows:

" * * * The law is now well established in this State that an owner or occupier of land may relieve himself of liability for harm to his invitees from dangerous conditions on the premises which are not open and obvious by taking proper precaution to protect them from the dangers or by warning them thereof. Halepeska v. Calihan Interests, 371 S.W.2d 368 (Tex. Sup.1963); Western Auto Supply Co. v. Campbell, 373 S.W.2d 735 (Tex.Sup. 1963). The law is equally well established that the owner or occupier owes no duty to his invitees either to eliminate or to warn of dangerous conditions on the premises which are as well known to them as they are to him. McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954); Hall v. Medical Bldg. of Houston, 151 Tex. 425, 251 S.W.2d 497 (1952). * * *

* * * * * *
* * * *This holding brings us face to face with the question of whether an adequate warning to an independent contractor or one supervising his work will discharge the duty of the landowner or occupier to warn the employees of the independent contractor; and we hold it will.*

* * * Moreover, an independent contractor owes a duty to his employees to warn them of dangers on the premises where they are required to work which are known to him. This duty was recognized in [Galveston-Houston Electric Ry. Co. v.] Reinle [113 Tex. 456], 258 S.W. 803, 805. The owner or occupier should not be required to foresee and anticipate that the contractor will not discharge his duty to his own employees, and there is no sound basis for requiring that the employees should be twice warned.

The burden was on Henry to establish that Delhi-Taylor breached a duty owed him. McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954). He obtained jury findings that Delhi-Taylor was negligent in failing to take precautions to protect him from the danger of gas escaping from its pipeline. These findings did not establish that Delhi-Taylor had breached a duty owed him inasmuch as the duty owed him could be discharged by warning him of the danger. Not only did Henry fail to obtain a jury finding of breach of the duty to warn, but the evidence establishes conclusively, as pointed out herein, that the duty was not breached."

As heretofore indicated it is undisputed that Glenn, supervisor of the work for the independent contractor on the job, who was also the employer of appellant Pembrook, had been warned, was aware of and appreciated the dangerous condition which resulted in appellant's injury. Such warning and knowledge on the part of Glenn as supervisor on the job discharged the duty, if any, on the part of Phillips to warn the employees of the independent contractor. Appellant's point is overruled.

The judgment is affirmed.