Samuel C. DEES and International Insurance Company, Appellants,

v.

EL PASO PRODUCTS COMPANY, a Corporation, Formerly El Paso Natural Gas Products Company, Appellee.

No. 6141.

Court of Civil Appeals of Texas, El Paso.

Sept. 22, 1971.

Rehearing Denied Oct. 20, 1971.

Burnett & Childs, Richard J. Clarkson, Phillip D. Hardberger, Odessa, Turpin, Smith, Dyer, Harman & Osborn, Max N. Osborn, Midland, for appellants.

Shafer, Gilliland, Davis, Bunton & McCollum, Paul McCollum, Odessa, Hardie, Grambling, Sims & Galatzan, Harold L.

Sims, John Grambling, El Paso, for appellee.

## OPINION

WARD, Justice.

This is an appeal from a summary judgment. Samuel Dees, the Appellant and the Plaintiff below, was seriously injured while working as a welder's helper for Fish Engineering & Construction Company, Inc. Fish Engineering, as an independent contractor, was building an extensive nylon manufacturing plant for and on the premises of El Paso Products Company at the time of the accident, and Dees as the independent contractor's employee, brought the present suit against the owner-contractee for the personal injuries received. International Insurance Company, as the workman's compensation insurance carrier for the independent contractor, has intervened to recover the sums paid to and for Dees under the compensation act. We are of the opinion that the summary judgment was correct and that it should be affirmed.

As to the nylon manufacturing complex being constructed by Fish Engineering, there were some six separate plants or units which were in the process of completion in the year 1965, and were being delivered at various times to El Paso Products Company for operation. The two with which we are concerned were the ammonia plant and the nylon off-site facilities, the start-up date or date of acceptance by El Paso for the ammonia plant being about August 7, 1965, and that for the off-site plant being in October of 1965. To activate and operate the instruments in the various plants and sites, an instrument air line had been constructed coming from a foreign source of supply for nitrogen and going through a portion of the off-site plant and then on into the ammonia plant. The instrument air line was designed and intended to supply either processed "dry air" or the inert gas nitrogen to the instruments in the entire complex. Ordinary untreated air cannot be used in the instrumentation because of its corrosive effects upon the instruments, and it is necessary to "dry" and "scrub" raw air to make it suitable to use in the instruments. Nitrogen can be used in the instruments likewise if there is an available supply without any kind of processing or treatment. The plants were designed to use the "dry air" most of the year and with nitrogen being used in the cold weather as even the dried air then became unsuitable. At the time of the completion of the ammonia plant and its delivery to El Paso Products Company, Fish had not completed the processing plant where "dry" air was to be produced to supply the instruments so that "dry air" had never been contained in the instrument air line, and nitrogen was continuously contained therein and used to supply the instruments with instrument air. The instrument air line had been constructed, tested and filled with nitrogen by Fish under the supervision and direction of one of the job superintendents, George Rice, originally in order to test the instruments that Fish had installed in the ammonia plant and thereafter to enable the instruments to operate properly. At that time, Fish had "flagged" the instrument air line with either red or orange flagging every ten or fifteen feet to indicate to its workmen that the line was "loaded", not necessarily with nitrogen, but with some material. Near the instrument air line as it crossed the off-site facilities, a steamline some eighteen inches wide and 2000 feet long was in the process of being constructed by Fish and on September 21st, a defective weld was discovered in one of the joints in this steamline. This was in the off-site area and at the time, was under the exclusive control of Fish. George Rice, as job superintendent for Fish on the off-site facilities, ordered certain of his Fish employees to backweld the defective connection. The Appellant, Dees, under orders of his welder, Abe Steel, climbed into the pipe with his grinder to knock off any excess slag at the seam in order that the welder could properly backweld the joint. A pipe fitter for Fish, M. L. Moore, who was also under the

supervision of George Rice, was told by Mr. Rice to run an air line into the steamline and discharge a flow of compressed air therein in order to clear out stale air and the fumes that would come from the welding torch when the backwelding started. To do this, Mr. Moore tied into the instrument air line at a nearby valve and with a hose, inserted the material in the instrument air line into the inside of the steamline where Mr. Dees was working. In the confined space within the steamline, the nitrogen from the instrument air line apparently soon dispelled all of the natural air and oxygen within the steamline and Mr. Dees was rendered not only unconscious, but suffered serious brain damage before he could be extricated from the pipe.

Mr. Moore's version of the accident was to the effect that he had not only been directed by Mr. Rice to tie the hose into the instrument air line but had been shown two valves to open to get the air into the hose and steamline and that he did exactly what he had been told to do by George Rice. He assumed that the instrument air line contained compressed air only. Mr. Rice's version was to the effect that after giving his orders to the Fish crew to do the backwelding, that he had given instructions to the crew to run an air line into the steamline to ventilate the same before doing the backwelding and that he had instructed the Fish crew to use a portable air compressor which would pump natural air into the steamline. He had consistently ordered the Fish foremen in the area to prohibit any connection to or use of the "instrument air line" for any purpose as use of that line would drop the pressure to the instruments and would cause malfunction of the instruments and termination of operations in any portion of the plant then in operation including the ammonia plant.

The Appellant's theory was that the Appellee was liable for having negligently failed to warn the employees of Fish that the instrument air line contained nitrogen and for having made available to the Fish employees nitrogen instead of dry air in the instrument air line. It is the Appellee's position that the summary judgment proof has established as a matter of law, that there is no genuine issue of fact as to several of the essential elements of the cause of action, and that the burden of Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.Civ.App.1970) has been met.

Assuming that under the undisputed facts present, that there existed a duty upon the Appellee to warn the Appellant of the dangers involved in working near the instrument air line, that duty was fully discharged. If the owner or occupier of property is under a duty to warn the employees of an independent contractor who has undertaken to do work on the property of hidden or inherent dangers on the property, that duty is discharged if those in charge of the work for the independent contractor are given warning or have knowledge of the danger. This is the unequivocal holding of Delhi-Taylor Oil Corporation v. Henry, 416 S.W.2d 390 (Tex. Civ.App.1967). The full knowledge by the independent contractor of any danger involved fully discharged the landowner's duty to warn the employees. Not only did the foremen of Fish know of the substance in the air line but they knew and appreciated any danger of using the inert gas in a confined space. Gulf Oil Corporation v. Bivins, 276 F.2d 753 (5 Cir. 1960); Turner v. West Texas Utilities Company, 290 F.2d 191 (5 Cir. 1961); Tyler v. McDaniel, 386 S.W.2d 552 (Tex.Civ.App. Dallas, 1965, writ re'f, n. r. e.)

The Appellant's contention that at the time of the accident, the Appellee had taken over the safety practices at the place where the Fish welding crew were working is not supported by the affidavits. No exception to the rule of Delhi-Taylor (Supra), can be found in these facts.

Under our disposition of the case, the other matters presented by the respective parties are not discussed.

The judgment of the trial Court is affirmed.