Max Franklin KELLEY, Plaintiff-Appellee,

v.

GENERAL TELEPHONE COMPANY OF the SOUTHWEST, Defendant, Third-Party Plaintiff-Appellant-Appellee,

v.

Vernon L. CLARK, d/b/a Clark Enterprises, Third-Party Defendant-Appellant,

Pacific Indemnity Company, Intervenor-Appellee.

No. 72–2318.

United States Court of Appeals, Fifth Circuit.

Oct. 17, 1973.

Rehearing and Rehearing En Banc Denied Nov. 19, 1973.

Thomas W. Hathaway, Tyler, Tex., for General Telephone.

Otto A. Ritter, Rex A. Nichols, Longview, Tex., for Clark and Pacific Indemnity Co.

W. R. Barnes, Odessa, Tex., for Max Franklin Kelley.

Before GOLDBERG, AINSWORTH and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

The issues in this Texas diversity case concern the liability of an occupier to an invitee, in this case an employee of an independent contractor hired by the occupier to work on the occupier's land. We affirm the district court's judgment, entered on the jury verdict, for the employee. In the third party action based on an indemnity agreement between the occupier and the independent contractor, we reverse the district court's judgment in favor of the occupier.

I.

The facts are basically undisputed. In July 1967 Max Franklin Kelley, the plaintiff-appellee, was working as a lineman for Clark Enterprises, an independent contractor. On July 21, 1967, General Telephone Company contracted with Clark for the dismantling and removal of a telephone line near Jacksonville, Cherokee County, Texas. Although the line was old and there is testimony that it might have been necessary to dismantle it in the near future, this particular work was necessitated by the relocation of a highway.

The accident giving rise to this suit occurred around noon on July 26. Max Kelley had ascended a telephone pole and was in the process of removing the crossarm when the pole fell, pinning him beneath it. He suffered serious injuries to his right leg and ankle, as well as his back. The reason the pole fell with Kelley is that it was rotted through four to six inches below ground level. For this reason it would not support Kelley's weight once the wires connecting the pole to other poles in the line had been removed.

Kelley filed this diversity action against General Telephone asserting various theories on which General was liable in tort for his injuries. General filed a third party action against Kelley's employer, Clark Enterprises, seeking recovery on the basis of an indemnity clause in the construction contract between General and Clark. This action was severed from the tort suit and tried to the court. Kelley's action against General went to the jury on the court's general charge, and the jury returned a verdict in favor of plaintiff. In answer to special interrogatories submitted by the court, the jury said that its verdict was founded on defendant's negligence in failing to inspect the defective pole prior to the work and also in failing to warn plaintiff of the defective condition of the pole. The jury necessarily rejected defendant's defensive theories which were submitted in the court's charge. These were that defendant was not negligent, that plaintiff was contributorily negligent, that the sole proximate cause of the accident was the conduct of the independent contractor, Clark, and that the accident was unavoidable. The district court entered judgment on the jury's verdict and General appealed. Clark has appealed from the trial court's

entry of summary judgment in favor of General in the third party action.

## II.

■■■ The duties owed in Texas by an occupier of premises to an invitee are well established. In Adam Dante Corp. v. Sharpe, 483 S.W.2d 452, 454 (Tex. 1972), the Texas Supreme Court said:

"* * * The duty is that which is summarized in Restatement (Second) of Torts § 343 (1965):

§ 343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

The occupier is under the further duty to exercise reasonable care in inspecting the premises to discover any latent defects and to make safe any defects or to give an adequate warning. Restatement (Second) of Torts § 343, Comment b (1965)."

*See* City of Beaumont v. Graham, 441 S.W.2d 829 (Tex.1969); Halepeska v. Callahan Interests, Inc., 371 S.W.2d 368 (Tex.1963). As the owner of the easement on which the telephone line was located, General is an occupier under Texas law. Kelley is an invitee because he was employed by an independent contractor hired by the occupier to do work on the premises. *See* Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425 (1950).

Because the evidence is undisputed that General did not inspect the telephone line or warn Kelley of any dangerous condition in the line and because the jury found that this conduct was negligent, General advances three theories to support its contention that it owed "no duty" to plaintiff under Texas law. The trial court declined to give jury instructions embodying these theories, and General asserts error in this regard.

■■ General argues first that the defective condition of the pole was "open and obvious," and thus there was no duty to warn Kelley of its condition. *See* Myers v. Day and Zimmerman, 427 F.2d 248 (5th Cir., 1970); Halepeska v. Callahan Interests, Inc., *supra.*[1] "In the 'no duty' situation . . . knowledge either actual or charged in law, is crucial." Myers v. Day and Zimmerman, *supra* at 252. There is no basis in this record for the conclusion that Kelley had actual knowledge of the rotted condition of this telephone pole.[2] The defect was hidden four to six inches below the surface of the ground and was not known to Kelley, or anyone else for that matter, until the pole fell. Nor do the facts

---

1. In *Myers,* Judge Gewin summarized the "no duty" doctrine as follows:

"Texas requires the occupier of premises to keep them in reasonably safe condition for his invitees. He is obliged to inspect and discover hazardous conditions. With respect to those dangers of which he is aware, or should be aware because of his obligation to inspect, he has a *duty* 'to take such precautions as a reasonably prudent person would take to protect his invitees therefrom or to warn them thereof.' However, this duty does not extend to defects which constitute 'open and obvious' dangers—hence the 'no duty' principle.

"The exception rests on the proposition that there could be no obligation to warn a person of something he already knows or of a danger so apparent that he will be charged with knowledge as a matter of law."

427 F.2d at 252.

2. Chief Justice Greenhill of the Texas Supreme Court has stated, "My understanding of 'open and obvious' in 'no duty' cases is expressed by the popular phrase of the comic strip character, Li'l Abner: the defect must be one that 'any fool could plainly see.'" Greenhill, Assumption of Risk, 16 Baylor L.Rev. 111, 118 (1964).

here present a situation in which Kelley should have been charged in law with knowledge of the condition of the pole. *See, e. g.,* Wesson v. Gillespie, 382 S.W. 2d 921 (Tex.1964); Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607 (1952); Houston Nat'l Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374 (1948); Corley v. Laco Rentals, Inc., 487 S.W.2d 446 (Tex.Civ. App., Waco 1972, no writ history). *See generally* Greenhill, Assumption of Risk, 28 Tex.B.J. 21 (1965).[3]

General also argues that Kelley's injury resulted not from a dangerous condition on the premises where he was working, but from the nature of the work he was doing, and relies on several Texas cases to support this proposition. Humphreys v. Texas Power & Light Co., 427 S.W.2d 324 (Tex.Civ.App., Dallas 1968, writ ref'd n.r.e.); Tyler v. McDaniel, 386 S.W.2d 552 (Tex.Civ.App., Dallas 1965, writ ref'd n.r.e.); Perez v. Hernandez, 317 S.W.2d 81 (Tex.Civ. App., San Antonio 1958, writ ref'd n.r. e.); Nance Exploration Co. v. Texas Employers Ins. Ass'n, 305 S.W.2d 621 (Tex.Civ.App., El Paso 1957, writ ref'd n.r.e.); Moore v. Texas Co., 299 S.W.2d 401 (Tex.Civ.App., El Paso 1957, writ ref'd n.r.e.). A reading of these cases reveals that they are clearly inapposite to the facts of our case. Kelley was injured because the telephone pole was rotted below the surface of the ground. This is obviously a condition of the premises.

As the final element of General's no duty based arguments, we are asked to apply an exception to the rules relating to an occupier's duty to employees of an independent contractor which has not previously been adopted in Texas.

"[A]s an exception to the general rule requiring the owner or occupier of premises (contractee) to furnish a safe place of work to an independent contractor and the latter's employees, the owner or occupier is under no duty to protect them against risk arising from or intimately connected with defects of the premises, or of the machinery or appliances located thereon, which the contractor has undertaken to repair."

City of Beaumont v. Graham, *supra,* at 834, of 441 S.W.2d *quoting* 31 A.L.R.2d 1375, 1381 (1953). General's problem is that its contract with Clark was not a repair contract, but was rather a contract to dismantle a telephone line. The latter is not so closely analogous to a contract of repair to justify applying the exception in this case. Especially is this true in light of the Texas Supreme Court's failure to apply the exception in the *Graham* case, and the court's statement to the effect that, even assuming it would apply the exception, it would do so with respect to *"risks only intimately connected with defects* which the contractor has undertaken to repair. . . ." 441 S.W.2d at 835. We decline to apply the exception here.

3. The Texas Supreme Court recently clarified the meaning of the term "open and obvious" in Adam Dante Corp. v. Sharpe, 483 S.W.2d 452 (Tex.1972); the court opined that the correct use of this term means "that the proof shows the condition was so patent as to charge plaintiff with knowledge and appreciation of the danger. In this sense there is no issue of fact." *Id.* at 457. General was therefore not entitled to a jury instruction once the court determined that the condition was not open and obvious as a matter of law, but because this case was tried prior to the decision in *Adam Dante* the lower court did not have the benefit of the Texas Supreme Court's clarification of this question. After *Adam Dante* a plaintiff must make prima facie proof that he did not know and appreciate the danger and that he should not be charged in law with knowledge and appreciation of the danger in order to go to the jury on defendant's negligence. *Id.* at 459. Kelley clearly met the standard here, and the district court properly refused to instruct the jury regarding "open and obvious" dangers. *See* Massman-Johnson v. Gundolf, 484 S.W.2d 555 (Tex.1972). Even prior to *Adam Dante,* this court applied similar reasoning to the open and obvious question. Myers v. Day and Zimmerman, *supra,* at 252 of 427 F.2d.

■ General also seeks a reversal because the trial court refused to instruct the jury on its affirmative defense of *volenti non fit injuria,* voluntary assumption of the risk.[4] Although this doctrine of Texas law has been criticized,[5] it is nonetheless a viable defensive theory to tort liability. The elements of this defense are as follows:

"(1) The plaintiff has knowledge of facts constituting a dangerous condition or activity; (2) he knows the condition or activity is dangerous; (3) he appreciates the nature or extent of the danger; and (4) he voluntarily exposes himself to this danger."

J. & W. Corp. v. Ball, 414 S.W.2d 143, 146 (Tex.1967). Without detailing the evidence in this record, suffice to say that we have read the record [6] and agree with the district court that there is no evidence to support a *volenti* instruction. Max Kelley did not have actual knowledge of the defective pole. In his seven years of experience as a lineman he had never seen a pole fall because it was rotted through below the surface. Even though the evidence in the record might support the conclusion that he should have known of the condition of the pole, a *volenti* defense is not raised by this type of evidence. "The Texas Supreme Court has expressly held that *volenti* is not established by a finding that the plaintiff *should* have known and appre-

ciated the danger in the exercise of ordinary care." Myers v. Day and Zimmerman, *supra,* at 251 of 427 F.2d citing Halepeska v. Callahan Interests, *supra,* at 379 of 371 S.W.2d. *See* Pope v. Holiday Inns, Inc., 464 F.2d 1303 (5th Cir., 1972).

■ The most troublesome issue in this appeal is whether the trial court erred in not instructing the jury that General's duty to Kelley would be discharged if the independent contractor, Clark, had full knowledge of the danger involved in Kelley's climbing the telephone pole. More specifically, the issue is whether the evidence in this record and the applicable Texas law support such an instruction. The pivotal case is Delhi-Taylor Oil Corp. v. Henry, 416 S.W. 2d 390 (Tex.1967). As does our case, *Delhi-Taylor* concerns the liability of an occupier to an employee of an independent contractor. The independent contractor, Roy Vickers Lease Service, had been hired by Delhi-Taylor to extend the casing around Delhi-Taylor's pipelines which were used to carry various hydrocarbons from its refinery to the docks on the ship channel. While using a dragline to uncover the pipelines, an employee of Vickers punctured one of the lines allowing a highly flammable gas to escape. Henry, the plaintiff, was welding nearby, and he was seriously burned when the drifting gas came in contact with his welding torch.

4. Recognizing that there existed some confusion in the use of the terms "voluntary assumption of risk" and *"volenti non fit injuria,"* the Texas Supreme Court recently stated that the two are basically synonymous.

"* * * In Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951), we recognized the historical limitation of the assumption of risk doctrine to cases arising out of a master-servant or some other contractual relationship. That case, however, held that the same principles could be applied more broadly under the doctrine known as volenti. The distinction between the two has been said to be one without a difference. W. Prosser, Law of Torts § 68 (4th ed. 1971); 2 F. Harper & F. James, The Law of Torts

§ 27.13 (1956). In the present status of the law we do not limit voluntary assumption of risk to master-servant and contractual relationships, and we regard volenti as an extension to, as well as another name for, voluntary assumption of risk." Adam Dante v. Sharpe, *supra,* at 458 of 483 S.W.2d.

5. *See generally* Edgar, Voluntary Assumption of Risk in Texas Revisited—A Plea for its Abolition, 26 Sw. L.J. 849 (1973).

6. Interestingly, the appendix filed by the parties does not contain the testimony taken at the trial of this case. We have obtained the original record, and it is on the basis of the reading of it that we draw our conclusions regarding the evidence.

Although Delhi-Taylor had not taken proper precautions to protect Henry, it had warned both Vickers and his foreman, Smith, "that they should treat all these lines 'as though they were loaded' and 'as if they were under pressure.'" 416 S.W.2d at 393. The court noted that:

". . . Indeed, Smith confirmed the warning; he testified that Mr. Perkinson, Delhi-Taylor's foreman, 'certainly did' make it 'pretty clear that those lines were loaded'; that 'Everybody knew it.' As a matter of fact, Smith testified that he warned the dragline operator that 'the lines were loaded,' which, 'in pipeline work,' means 'that the line is dangerous' and can be carrying any kind of 'inflammable material,' including 'gasoline or natural gas.'"

416 S.W.2d at 393. There was additional testimony that both Vickers and Smith were extremely familiar with the conditions encountered when working around loaded pipelines.[7] Delhi-Taylor had also shown both Vickers and Smith a plat which established the horizontal position but not the actual depth of the loaded lines:

"On the basis of the evidence set out, we hold that the warning given to Vickers and his foreman that the lines should be treated 'as though they were loaded,' when considered with their knowledge of the condition of the premises and the dangers inherent therein, was adequate to discharge Delhi-Taylor's duty to Vickers and his foreman. This holding brings us face to face with the question of whether an adequate warning to an independent contractor or one supervising his work will discharge the duty of the landowner or occupier to warn the employees of the independent contractor; and we hold it will."

*Id.* at 393. The court went on to say that:

"While an owner owes a duty to employees of an independent contractor to take reasonable precautions to protect them from hidden dangers on the premises or to warn them thereof, an adequate warning to or full knowledge by the independent contractor of the danger should and will be held to discharge the landowner's alternative duty to warn the employees."

416 S.W.2d at 394.

In *Delhi-Taylor* the nature of the warning to the independent contractor gave him full knowledge of the specific dangers involved. The contractor and his foreman—the person supervising the work—both knew that the lines on which they would be working were loaded. The Texas cases which have applied the *Delhi-Taylor* rule have followed this pattern: (1) the contractor or his supervisor have been warned in such a manner that they either have specific knowledge of the danger involved; or, (2) the contractor or his supervisor have actual knowledge, independent of a warning from the occupier, of the dangerous condition of the premises. *E. g.,* Koppers Co. v. Haggerty, 488 S.W.2d 600 (Tex.Civ.App., Beaumont 1972, no writ history); Keeth v. Phillips Petrole-

---

7. "Both Vickers and Smith had many years' experience in working on and around pipelines carrying petroleum products. Vickers had devoted a good bit of his time during fifteen years in the business to work which 'necessitated the uncovering of buried lines,' and was 'thoroughly familiar with the work.' According to him, it is 'a fairly common practice' to uncover pipelines with a dragline, and 'lots of times' he had used a dragline to uncover 'loaded lines' or 'gas lines under pressure.' Smith had been district superintendent for Vickers for five years and had seventeen years' experience working around loaded pipelines. He had worked for a number of employers and had been a pipeline superintendent where he 'had a double dose of loaded lines.' According to Smith, the precautions to be taken when working around pipelines are standard, i. e., '* * * any existing line, you assume to be loaded * * *.'" 416 S.W.2d at 393. There is no testimony in the case at bar establishing that either Clark or Myers had analogous knowledge concerning the danger of telephone poles rotting below the surface.

um Co., 482 S.W.2d 291 (Tex.Civ.App., Amarillo 1972, writ ref'd n. r. e.) ; Coastal States Crude Gathering Co. v. Williams, 476 S.W.2d 339 (Tex.Civ.App., Corpus Christi 1971, writ ref'd n. r. e.) ; Dees v. El Paso Products Co., 471 S.W. 2d 630 (Tex.Civ.App., El Paso 1971, writ ref'd n. r. e.) ; Pembrook v. Phillips Petroleum Co., 463 S.W.2d 236 (Tex.Civ.App., Eastland 1971, writ ref'd n. r. e.) ; Humphreys v. Texas Power & Light Co., 427 S.W.2d 324 (Tex.Civ. App., Dallas 1968, writ ref'd n. r. e.) ; Romero v. Horlock, 425 S.W.2d 679 (Tex.Civ.App., Houston [14th Dist.] 1968, writ ref'd n. r. e.). *See also* Turner v. West Texas Utilities Co., 290 F.2d 191 (5th Cir., 1961) ; Gulf Oil Corp. v. Bivins, 276 F.2d 753 (5th Cir., 1960).

 Our examination of the record in the instant case leaves us convinced that there is insufficient evidence to support the requested instruction. When the evidence is considered against the standard established in *Delhi-Taylor* and applied in subsequent cases, there is no basis on which reasonable men or women could conclude that the independent contractor, Clark, had full knowledge of the dangerous condition of the premises on which his employees were to dismantle the telephone line. The evidence relied on by General to support its requested instruction does nothing more than establish that Clark and Myers, the partner in charge of the work, knew that old telephone poles are dangerous and that this line contained old poles.[8] This is simply not enough. General had a life history of all the poles in the line available in its files. General knew that the particular pole which fell with Kelley was installed in 1929 and was among the oldest poles in the line being dismantled. There is testimony from General's witnesses that the life expectancy of an average pole is from thirty to fifty years. Thus, General could easily have warned Clark, or his employees, that this pole was approaching the limits of its expected life. This could have been accomplished by noting on the plat furnished to Clark the date of installation of each pole in the line with the warning that poles of a certain age are particularly dangerous. But the plat given to

8. The following colloquy between defendant's counsel and Mr. Clark is illustrative:

Q And while we are on the subject, with reference to the particular poles and lines that were being wrecked on the day that the Plaintiff was injured, had you actually looked at those lines and poles yourself before you ever commenced the job?

A Not closely.

Q Well, with reference to the whole system, had you gone through it—?

A Yes.

Q —to see where the work was going to be located?

A Yes. I had ridden over the system.

Q I don't mean to infer you went up and looked at each and every pole.

A No, sir.

Q But you do have a remembrance of what all the poles in the system look like?

A Yes, sir.

Q Was it an older type system? That is, I mean were the poles on the average, say, 15 years or older?

A They may have been about that, unless there had been some replacements. There were a few good poles in the line, newer ones.

Q But by and large, was the system one consisting of what we call older poles?

A Yes.

Q And as the contractor on this job, did this provide you with notice that there would be in view of that fact, that there would be a danger of decay of poles which would be decayed or rotten below ground, that there would be a danger of that?

A It gave me that thought.

Q Well, did the age of the system and your visual—over-all visual inspection of the system before you commenced the work provide you with notice or place you on guard, alert you to the fact—?

A Yes, sir.

Q —to the danger that one or more of the poles in that system might be decayed or rotten below ground?

A I didn't know whether they would be rotten below ground or not. I knew some of the poles were quite old.

Q Well, did it provide you any notice at all?

A That they were old.

Q And as to such a danger?

A And that they could be dangerous, yes."

Clark did not contain this information. In sum, General could have provided more specific information and, had it done so, discharged its duty.[9] In the absence of such specificity and of conduct exhibiting an attention to the dangers which it knew were present,[10] General cannot rely on Clark's general knowledge that old poles are dangerous in order to discharge its duty as an occupier to employees of its independent contractor under the *Delhi-Taylor* rule.

We agree with the implicit conclusion of the district court that the facts of this case raised primarily issues of negligence and contributory negligence. The evidence adduced by General provided more than adequate, though not conclusive, support for its position that Kelley was contributorily negligent. It does not, however, provide support for the other defensive theories asserted to avoid liability. The case was submitted to the jury on proper instructions, and the jury resolved the conflicting evidence in favor of the plaintiff, Max Kelley. We affirm that decision.

### III.

■ We turn now to Clark's appeal from the district court's order in the third party action granting General's motion for summary judgment—thus holding that General was entitled to indemnity for its own acts of negligence. Whether the district court was correct depends on an interpretation of the indemnity clause in the parties' construction contract; it should go without saying, but we repeat the maxim anyway, that this interpretation must be in accord with the applicable Texas law. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The indemnity provision reads as follows:

"The Contractor agrees and binds himself to indemnify the Telephone Company and to save it whole and harmless from all claims, demands and causes of action, for injuries to, or deaths of person, and damage to, or loss of property *growing out of or based upon or resulting from anything the Contractor, his agents, servants, or employees, or sub-contractors, may do, or omit to do, in the execution of this contract,* and shall pay all judgments that may be rendered against the Telephone Company therefor, and shall reimburse the Telephone Compa-

---

9. Although the following testimony was taken out of the presence of the jury, it supports the district court's legal conclusion not to instruct the jury with reference to whether Clark had full knowledge of the danger involved:

"Q [By defense counsel] Do you recall, sir, whether you gave any warning or any admonition to Mr. Clark in connection with this job as to what sort of care, if any, he ought to take?

A [Mr. Spriggs, the employee of General in charge of the work] I don't recall a specific—if I may finish here—in all my dealings with Mr. Clark and our contractors I did admonish him on any of our jobs to be very careful with the way he put up our new facilities and for the care of our customers' property, things of this nature, his employees' well-being, our employees' well-being that had to follow through and maintain it, these kind of things. We had constant discussion with all of our people, contractors.

Q Well, specifically, with reference to this particular job, do you have any recollection whatsoever of any warning or ad-

monition, any special warning or admonition that you gave him or any warning or admonition, whether it be special or otherwise?

A No, not at this time."

10. Mr. Spriggs, currently a Division Plant Manager for General and the District Plant Supervisor for the area in which plaintiff was injured at that time, testified that he assumed this telephone line was "alive with hidden dangers." More than any other witness, including several who had extensive pole climbing experience, Mr. Spriggs expressed concern for the possibility—which he apparently regarded as substantial—that the older poles might be rotted below ground level. In view of his concern for and apparent knowledge of this possibility, the question arises as to why he did not do more to communicate his feelings to those doing the work (see note 9, *supra*), or at least furnish Clark with all the information General had in its files. The jury would have been warranted in inferring negligence on the part of General from his testimony.

ny for any expense for investigation, attorney's fees, or Court costs, in connection therewith."

The crucial language is that we have italicized. Whether Clark, by the use of this language, intended to indemnify General for liability imposed on General as a result of its own negligence is the issue.

Two preliminary observations are necessary at this point: (1) that in the underlying suit the jury found General negligent; and (2) that this finding would not necessarily preclude a finding that Clark was also negligent had Clark been a party to that suit. We thus reject Clark's contention that because the jury did not find for General on its defense that Clark's conduct was the sole proximate cause of the accident we can assume that Clark was not negligent.

An analysis of the Texas Supreme Court's recent decision in Adams & Son v. McCann Construction Co., 475 S.W.2d 721 (Tex.1972), will provide the necessary background for our decision. The question there was "whether subcontractor-petitioner, Joe Adams & Son, [was] legally obligated to indemnify general-contractor-respondent, McCann Construction Company, Inc., against the

consequences of the respondent's own negligence." *Id.* at 722. The pertinent portion of the indemnity agreement reads: "[Joe Adams & Son] shall . . . indemnify . . . McCann Construction Company, Inc., . . . [for] any and all claims, suits and actions of any kind or description, for damage or injuries to persons or property received or sustained by any party or parties *through or on account of any act or in connection with the work of* [Joe Adams & Son] . . .." Over a vigorous dissent by Chief Justice Calvert, joined by three justices, the majority held that this language was insufficient to manifest "an intention to protect the general contractor against liability for a casualty caused solely by the latter's negligence." *Id.* at 724. This holding rests primarily on two grounds: (1) that the indemnitee's (McCann Construction) actions were the sole cause of the underlying accident; and (2) that courts are generally reluctant to indemnify a party for its own negligence unless an indemnity agreement clearly provides for this result.[11]

The problem in applying the holding in *McCann* to our case stems not from minor variations in the indemnity agreement,[12] but rather from the reli-

11. "Texas follows the general rule that an indemnity agreement will not protect the indemnitee against the consequences of his own negligence unless the obligation is expressed in unequivocal terms. It is not necessary for the parties to say, in so many words, that they intend to save the indemnitee harmless from liability for his own wrongs, but it is necessary for that intention to clearly appear when all the provisions of the contract are considered in the light of the circumstances surrounding its execution. This was pointed out in Spence & Howe Construction Co. v. Gulf Oil Corp., Tex.Sup., 365 S.W.2d 631, where we stated that:

 \* \* \* Ordinarily, however, one does not contract against the results of his own negligence. Such agreements, except for insurance contracts, must be regarded as exceptional rather than usual in the majority of business transactions. Before such indemnity contracts may be enforced it must clearly appear that the contracting parties intended that the indemnitor would

be held liable for damages resulting from the negligence of the indemnitee.

 \* \* \* \* \*

"In Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775, this Court discussed the rule that an indemnity agreement will not protect the indemnitee against the consequence of his own negligence unless the obligation is expressed in unequivocal terms. The obvious purpose of this rule is to prevent injustice. A contracting party should be upon fair notice that under his agreement and through no fault of his own, a large and ruinous award of damages may be assessed against him solely by reason of negligence attributable to the opposite contracting party."

475 S.W.2d at 723–724.

12. The *McCann* court categorized the agreement there as one purporting to protect the indemnitee against liability arising from "any default or omission of Adams or its agents, servants or subcontractors in the perform-

ance throughout McCann on the conclusion that McCann Construction was solely responsible for the accident which resulted in its liability and for which it sought indemnity. The best, although · somewhat cumbersome, method to illustrate this reliance is to examine the court's opinion.

After summarizing the facts [13] and setting out the relevant provisions of the contract, the court rejected McCann's argument that Adams was liable because the accident, and ensuing injuries to Adams's workmen, arose out of "an act or in connection with the work" (quoting the indemnity agreement) of Adams under the construction contract. The court reasoned instead that:

"* * * McCann's liability arises from the fact that the accident was proximately caused by its own want of care, and there is no suggestion that · Adams or anyone under its supervision or control was at fault in any way. We thus have a casualty that would not have occurred but for the negligence of the indemnitee and to which the indemnitor contributed in no way except by doing its work in a careful and prudent manner."

475 S.W.2d at 723.

Then the court stated the general rule, and the policy underlying it,[14] that courts are hesitant to indemnify one for its own negligent acts. Referring to indemnity agreements generally the court stated:

"* * * A stipulation in such a contract that refers merely to injuries or damage resulting from the acts or in connection with the work of the subcontractor does not in itself clearly indicate an intention to protect the general contractor against liability for a casualty caused solely by the latter's negligence."

Id. at 724.

Turning more specifically to the contract before it, the court concluded that none of its provisions "clearly indicate an intention to protect the indemnitee against liability for damages caused solely by its own acts of negligence, · . . . ." Id. at 725.

The court next distinguished its opinion in Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex. 1963):

"The indemnity agreement in Spence & Howe, which contained language similar to that in the present case, was held to protect the indemnitee against liability for its own negligence. There the accident was caused by negligence of the indemnitee's employee while operating a crane owned by the indemnitee, and the indemnitor was not at fault. As pointed out in the opinion, however, the indemnitor had supervision of the entire operation and was actively using the indemnitee's crane and employee to do the work it had undertaken to perform. We therefore held that the contract

---

ance of the contract." 475 S.W.2d at 725. This characterization so closely parallels the wording of the agreement in the case at bar that it is futile to argue that because of a difference in the wording of the agreement McCann is not controlling.

13. "McCann was the general contractor for the erection of a building and contracted with Adams to do certain concrete work. McCann built wooden forms extending some eighteen to twenty feet above ground level into which forms employees of Adams' were to pour concrete from above for piers, beams and canopies. While three of Adams' employees were on top of the forms pouring concrete, the forms collapsed, and they, the wet concrete and the three employees all fell

to the ground. The employees were injured and they collected workmen's compensation benefits from Adams' insurer. They then sued McCann who called on Adams to defend the suit and filed a third party indemnity action against Adams. The trial court severed out the third party action and tried the damage suit to a jury. All three plaintiffs recovered judgments against McCann for substantial sums as damages upon findings by the jury that certain acts and omissions by McCann in connection with the construction and use of the forms were negligent and proximate causes of the injuries."
475 S.W.2d at 722.

14. See note 12, supra.

and the operations conducted in pursuance thereof could not be so divided as to make two operations, one conducted by the indemnitee and the other by the indemnitor. The contrary is true in the present case, and *the accident here was caused solely by the fault of the indemnitee* in performing an operation for which it was exclusively responsible and which was completed before the indemnitor began doing its work under the contract."

475 S.W.2d at 725 (emphasis added).

Finally, the court concluded with the following statement:

"* * * If we are to do anything more than give lip service to the rules declared in *Spence & Howe,* a general contractor who wishes to be protected against liability for damage caused solely by his own negligence must arrange for the obligation to be expressed in clearer terms than those used in the agreement now in question."

475 S.W.2d at 726.

We recently had occasion to rely on *McCann* in Gantt v. Mobil Chemical Co., 463 F.2d 691 (5th Cir., 1972). The facts there clearly warranted that reliance, however, because "The jury found that Gantt was injured solely as a result of Mobil's [the indemnitee] failure to bleed the line of ammonia before Stearns' [the indemnitor] employees went to work on it." *Id.* at 704. Neither *McCann* or *Gantt* can be considered as controlling in this case because we cannot conclude that General's negligence was solely responsible for the accident.

Understandably, Clark relies heavily on general statements from *McCann* and *Gantt* to the effect that the indemnity language must fairly warrant the conclusion that the parties expected to shield the indemnitee even against the consequences of his own wrong before a court will hold for the indemnitee. General relies principally on the wording of the agreement, but also seeks to distinguish cases refusing to indemnify and bring the facts here within the holding of cases granting indemnity to the negligent party. *Compare* Spence & Howe Construction Co. v. Gulf Oil Corp., *supra,* and Crews Well Service v. Texas Co., 358 S.W.2d 171 (Tex.Civ.App., San Antonio 1962, writ ref'd n. r. e.) with City of Beaumont v. Graham, 441 S.W. 2d 829 (Tex.1969) and Bluebonnet Elec. Coop., Inc. v. Universal Elec. Construction Co., 467 S.W.2d 567 (Tex.Civ.App., San Antonio 1971, writ ref'd n. r. e.).

Our quandary over the proper choice between these two positions is ended with an examination of two recent decisions of the Texas Supreme Court. In the first, Sira & Payne, Inc. v. Wallace & Riddle, 484 S.W.2d 559 (Tex.1972), the indemnity agreement provided that Wallace & Riddle, the subcontractor-indemnitor, agreed to indemnify Sira & Payne, the contractor-indemnitee, "only for damages and costs arising out of injuries caused by the indemnitor's negligence or fault, or by the negligence or fault of its agents, servants or employees." *Id.* at 560. The court held that this agreement did not require the subcontractor-indemnitee to indemnify the contractor-indemnitor even though the underlying accident may have been caused by the concurrent negligence of both parties. We think it is appropriate to include the following lengthy quote from Chief Justice Calvert's lucid opinion:

"* * * In deciding Adams v. McCann, we reiterated the rule earlier expressed in Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775 (1957), and Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex.1963), that an indemnity agreement will not be held to protect an indemnitee against the consequences of his own negligence unless the obligation is expressed in clear and unequivocal language; and, moreover, the effect of our decision was to hold that parol evidence is not admissible to show that such was the intention of the parties when the obligation

is expressed in language which is unclear or equivocal.

"Applying the rule in this case, it seems obvious that the contract between the parties does not, in clear and unequivocal language, express an obligation on the part of Wallace & Riddle to indemnify Sira & Payne against the consequences of its own negligence, whether such negligence was the sole proximate cause of McDonald's injuries, or jointly or concurrently with the negligence of Wallace & Riddle or another was only a proximate cause of such injuries. This is so even though in the factual context in which the contract was negotiated and executed there was little or no possibility of liability on the part of the indemnitee, and inclusion of the obligation for indemnity may, for that reason, have been meaningless. Viewed in the context of our decision in *McCann*, our conclusion as here stated is a sounder basis for our holding in [City of Beaumont v. Graham, 441 S.W.2d 829 (Tex.1969)] than the one there given, i. e., that the language of the contract there under consideration established, as a matter of law, an intention to indemnify 'against damages or claims resulting solely from acts or conduct' of the indemnitor. It follows from our decision in *Graham*, as here interpreted and in the absence of some other decisive consideration, that Wallace & Riddle are not required by their contract to indemnify Sira & Payne for the consequences of the concurrent negligence of the parties."

Id. at 561.

*Sira & Payne* precludes the conclusion that the agreement here could be construed to provide indemnity for General simply because its conduct may not have been the sole cause of the liability producing accident. Moreover, the thrust of the opinion is that a semantic comparison of the various indemnity agreements which have spawned considerable litigation in Texas in recent years [15] is a poor method for determining whether the parties intended to indemnify one for his own negligence. Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co., 490 S.W.2d 818 (Tex.1973), provides the proof. The Texas Supreme Court began its opinion there by recognizing that its recent decisions "indicate a progressively stricter application of the rule" followed in Texas "and a majority of other jurisdictions that a contract of indemnity will not afford protection to the indemnitee against the consequences of his own negligence unless the contract clearly expresses such an obligation in unequivocal terms." *Id.* at 822. The court continued as follows:

"We have, in fact, progressed toward the so-called 'express negligence' rule as near as is judicially possible without adopting it and thereby requiring in all cases that the parties state, in so many words, that they intend to save the indemnitee harmless from liability for his own negligence. In this connection, it should be clear from our opinion in *McCann, supra*, including its discussion of the leading cases and modification of our opinion in Ohio Oil Co. v. Smith, 365 S.W.2d 621 (Tex.1963), that broad general statements of the indemnity obligation are not sufficient to protect an indemnitee against his own negligence, . . . ."

*Id.*

The language in the agreement between General and Clark is different only in degrees from that present in the other cases recently considered by the Texas Supreme Court. We are compelled to conclude that it is insufficient to meet the standard of clearly and unequivocally manifesting an intention to indemnify General for liability arising from its own negligent acts.[16]

---

15. For a collection of cases refer to Gantt v. Mobil Chemical Co., 463 F.2d 691, at 702 n. 6 (5th Cir., 1972).

16. General seeks to bring the facts here within the Texas Supreme Court's holding in Spence & Howe Construction Co. v. Gulf Oil

Because the district court did not have the benefit of the recent Texas decisions regarding the interpretation of indemnity agreements, its decision in favor of General must be reversed. In all other respects, the judgment appealed from is affirmed.

Affirmed in part and reversed in part.

Corp., 365 S.W.2d 631 (Tex.1963). While it is clear that *Spence & Howe* is still good law after both *Sira & Payne* and *Fireman's Fund,* and that it constitutes an exception to the general rule against indemnity, *see Fire-* *man's Fund,* 490 S.W.2d at 822, our case is not factually similar to *Spence & Howe* and, therefore, not within the exception it creates.