

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00217-CV

———————————————

RICHARD D. CRAWFORD, Appellant

V.

XTO ENERGY, INC., Appellee

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-262638-12

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

### Introduction

This appeal involves another title and contract dispute that appears to have resulted from the "frenzy to lease as many mineral rights as possible"[1] in the Barnett Shale. *See, e.g.*, *Green v. Chesapeake Expl., L.L.C.*, No. 02-17-00405-CV, 2018 WL 6565790, at *1–2 (Tex. App.—Fort Worth Dec. 13, 2018, no pet.) (mem. op.). Richard D. Crawford, the lessor under an oil-and-gas lease with XTO Energy, Inc., sued XTO after it determined he was not the owner of the oil and gas it had leased and refused to pay him royalties. The trial court granted summary judgment for XTO on all of Crawford's claims after determining that under the strip-and-gore doctrine, Crawford's predecessor had divested her ownership of the oil and gas in 1984; thus, neither Crawford nor his predecessor could have validly leased the oil and gas, and Crawford was not entitled to royalties. The trial court also denied a competing motion for partial summary judgment filed by Crawford. Because we agree with the trial court that the strip-and-gore presumption applies as a matter of law, and that Crawford's predecessor thus did not retain her interest in the oil and gas when conveying the surrounding property in 1984, we affirm.

---

[1] J. Zach Burt, *Playing the "Wild Card" in the High-Stakes Game of Urban Drilling: Unconscionability in the Early Barnett Shale Gas Leases*, 15 Tex. Wesleyan L. Rev. 1, 8 (2009) (explaining the rise of urban leasing techniques, in which independent landmen must compete to obtain leases from as many small landowners as possible in urban areas).

# Background

The parties relied on the following stipulated facts in their competing motions for summary judgment. In 1963, Mary Ruth Crawford became the owner of 145.99 acres in Tarrant County, Texas, through a partition deed. In 1964, Mary Ruth conveyed to Texas Electric Service Company (TESCO) the surface of 8.235 acres (the TESCO Tract) of her larger tract. The deed acknowledged that .093 of an acre of the TESCO Tract was located in a county road. The deed also contained two reservations of rights to Mary Ruth and one covenant by TESCO[2]:

> Grantors reserve unto themselves, [and] their heirs and assigns, the right to open streets over and across the [TESCO Tract] to construct, or cause to be constructed, water lines, sewer lines, gas lines[,] and telephone lines thereon; *provided* (1) that such streets shall not be closer than 300 feet apart, and shall be located so that the outer boundary thereof will not be less than 25 feet from any then-existing steel tower supporting any electric line thereon, (2) that such streets and utility lines shall not cross the lands herein conveyed at an angle of less than 45 degrees to the near side, (3) that such utility lines shall not interfere with Grantee's installations on such property at the time such utility lines are constructed, and (4) that such streets shall be constructed and maintained, including grading, surfacing, curbs[,] and gutters, at no cost or expense to Grantee.

> Grantors reserve unto themselves, [and] their heirs and assigns, the right to all oil and gas in and under the lands herein conveyed [(the **Disputed Tract**)] but expressly waive all rights of ingress and egress for the purpose of drilling for or producing oil and/or gas from the surface of the [TESCO Tract] *provided that* wells opened on other lands may be bottomed on [the TESCO Tract].

---

[2]Because the wording of these clauses in comparison to each other is critical to our analysis, we reproduce them verbatim. We retain the deed's plural usage of Grantors even though Mary Ruth was the sole grantor.

3

Grantee agrees that as long as Grantors' adjoining property is used for grazing or farming purposes, Grantee will erect no fences or other barriers along the lines dividing Grantors' property and the property herein conveyed; *provided, however, that* this agreement shall terminate should Grantors' adjoining property be subdivided for residential purposes. [Emphasis added.]

This picture shows the boundaries of the TESCO Tract and Disputed Tract in relation to the surrounding land:



After acquiring the TESCO Tract, TESCO placed steel electric towers along its entire length.

In 1984, Mary Ruth conveyed 76 acres of her adjoining land to the north and south of the TESCO Tract and Disputed Tract to a third party without reserving any of the oil and gas thereunder or mentioning her previously reserved right to the

Disputed Tract.[3] Over twenty years later, in 2007, Hollis R. Sullivan, Inc. leased the Disputed Tract from Mary Ruth. The lease allows the lessee to pool the Disputed Tract with other leased lands and generally prohibits surface operations, restricting development of the oil and gas to pooling "and/or . . . directional or horizontal drilling commenced from a surface location on other lands in such manner that the path of the wellbore is under and through the leased premises and the bottom-hole or terminus is on the leased premises or lands pooled therewith."

Mary Ruth died later in 2007, and Crawford inherited her estate. Crawford ratified the Sullivan lease in April 2009; by that time, XTO had acquired the lessee's interest. XTO or its predecessor had also acquired oil and gas leases from all of the mineral estate owners on both sides of the Disputed Tract. In May 2009, XTO pooled almost 800 leases, including Crawford's, into the Eden Southwest Unit.

Since 2009 XTO has completed and sold production from four wells in the Eden Southwest Unit. But XTO has never paid Crawford any royalties under the Sullivan lease because in 2011, after receiving a title opinion on the Disputed Tract,[4]

---

[3]The parties agree that after this conveyance, Mary Ruth owned no other surface or mineral rights adjoining the Disputed Tract.

[4]*See* Rob Davis, *A Landman's Work is the Foundation for Accurately Determining Mineral Ownership Under Rights-of-Way: So, How Should a Landman Search for Roadway Title?*, 18 Tex. Wesleyan L. Rev. 39, 40, 43 (2011) (describing role of landmen in researching mineral estate ownership, asserting that a proper pre-leasing ownership determination requires not only the landman's title search but also an attorney's title examination and written opinion, and describing three types of title opinions: lease purchase opinions created before a bonus is paid, drilling title opinions created before

XTO determined that Mary Ruth's 1984 conveyance of the adjoining lands also divested her title to the Disputed Tract under the strip-and-gore doctrine.[5]

Crawford sued XTO for breach of the lease, conversion, removal of a cloud on title, "money had and received," and for declaratory relief. XTO filed its own countersuit, which it later nonsuited.

After appeals on unrelated procedural grounds and a remand to the trial court,[6] XTO sought traditional summary judgment on all of Crawford's claims, arguing that the strip-and-gore doctrine applies as a matter of law; therefore, Crawford's claims, which are all based on his alleged property ownership, fail. Crawford filed a response to XTO's motion for summary judgment but also filed a traditional and no-evidence motion for partial summary judgment contending the strip-and-gore doctrine does

---

drilling begins, and division order title opinions); Paul G. Yale, *To Waive or Not to Waive? Analyzing Oil and Gas Title Opinion Requirements*, Landman at 23, 25 (Nov./Dec. 2009) ("It is increasingly common for companies drilling wells in the Barnett Shale, where units can include hundreds of town lots, to instruct their title examiners to limit review of documents to a point in time forward from when the urban subdivisions were platted. This increases title risk significantly but for some companies the risk is justified by an increase in timesavings and a decrease in abstracting and title examination costs.").

[5]XTO admits in its briefing that its predecessor obtained leases from both Mary Ruth and those in the chain of title from her 1984 conveyance. As XTO described the process, "It was truly a belt and suspenders approach. After a well was drilled and there was production, XTO had to decide who owned the minerals under the narrow strip of land beneath the electric company's lines and facilities and who was entitled to receive the royalty payments."

[6]*See Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 908, 914 (Tex. 2017).

not apply as a matter of law because there is no evidence that the Disputed Tract ceased to benefit Mary Ruth after her 1984 conveyance.

In response to Crawford's motion for partial summary judgment, XTO filed an affidavit from engineer Cary McGregor purporting to be an expert opinion on the monetary value of the Disputed Tract in 1984. Crawford objected to the affidavit and moved to strike it on timeliness and admissibility grounds, among others, but the trial court overruled his objections and refused to strike the affidavit.

After hearing argument, the trial court granted XTO's motion for summary judgment, denied Crawford's, and rendered a final judgment for XTO.

**Issues on Appeal**

Crawford's first issue presents a question of law: Did the trial court err by determining as a matter of law that under the strip-and-gore doctrine, Mary Ruth's 1984 conveyance of the remaining adjacent land also conveyed the Disputed Tract? In his second issue, Crawford contends that the trial court erred by denying his motion to strike the McGregor affidavit. And his remaining third through sixth issues raise complaints contingent upon his prevailing in his first issue. Because we conclude that the trial court could have properly granted XTO's motion for summary judgment even without considering the McGregor affidavit, we address Crawford's first issue only. *See* Tex. R. App. P. 47.1; *Reynolds v. Murphy*, 188 S.W.3d 252, 259 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g) (declining to address propriety of trial court's ruling on nonmovant's objections to movant's summary judgment evidence

because, even if court of appeals disregarded that evidence, appellant did not raise fact issue).

## Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *See Myrad Props.,*

*Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

### Strip-And-Gore Doctrine Applies And Crawford Did Not Rebut It; Mary Ruth Conveyed the Disputed Tract in 1984

The question of law raised in Crawford's first issue is common to the parties' competing motions for summary judgment.

**Applicable Law**

We have recently described and applied the strip-and-gore doctrine—a long-standing, policy-driven presumption employed to discourage litigation and title disputes—in a similar circumstance:

> Our objective when construing a deed is to give effect to the grantor's expressed intent in the deed's language. *See Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 321 (Tex. 2000). The strip-and-gore doctrine is used to aid in determining a grantor's intent—not as to the land described in the deed itself, but as to adjoining land not referenced in the deed. *Strayhorn v. Jones*, 300 S.W.2d 623, 638 (Tex. 1957) (holding that the doctrine applies only when a description of the specific strip is not included in the field notes of the adjoining land's conveyance; otherwise, there would be no need to employ a rule of construction or presumption); *see Angelo v. Biscamp*, 441 S.W.2d 524, 527 (Tex. 1969); *Cantley v. Gulf Prod. Co.*, 143 S.W.2d 912, 915 (Tex. 1940); *Red Boot Prod. Co. v. Samson Expl., LLC*, No. 09-14-00191-CV, 2015 WL 5730789, at *5 (Tex. App.—Beaumont Oct. 1, 2015, no pet.) (mem. op.); *Escondido Servs., LLC v. VKM Holdings, LP*, 321 S.W.3d 102, 109 (Tex. App.—Eastland 2010, no pet.); *Glover v. Union Pac. R.R.*, 187 S.W.3d 201, 212 (Tex. App.—Texarkana 2006, pet. denied); *Alkas v. United Sav. Ass'n of Tex.*, 672 S.W.2d 852, 857 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.); *Pebsworth v. Behringer*, 551 S.W.2d 501, 503–04 (Tex. Civ. App.—Waco 1977, no writ); *see also Snoddy v. Bolen*, 25 S.W. 932, 934 (Mo. 1894) ("In the vast majority of cases the rule works out the real intention of the parties at the date of the deed."); 23 Am. Jur. 2d Deeds § 254 ("It is presumed that a party granting land does not intend to retain a narrow

strip between the land sold and the boundary line in the absence of express provision to that effect in the deed, especially where the strip is so narrow *as to be of no practical use to the grantor*. This presumption . . . is, however, rebuttable, *the question being purely one of intention*; and when the intention is ascertainable from the face of the instrument or a record, other evidence is not admissible." (emphases added) (footnotes omitted)). The strip-and-gore doctrine applies when

> it appears that a grantor has conveyed all land owned by him adjoining a narrow strip of land that has ceased to be of any benefit or importance to him[;] the presumption is that the grantor intended to include [that] strip in [the] conveyance[] unless it clearly appears in the deed, by plain and specific language, that the grantor intended to reserve the strip.

*Crawford*[], 509 S.W.3d [at] 909 [] (quoting *Cantley*, 143 S.W.2d at 915).

Application of the strip-and-gore doctrine is highly policy-driven: it discourages title disputes and prolonged litigation—providing certainty in land titles—and encourages the use and development of real property. *See Angelo*, 441 S.W.2d at 526–27 (emphasizing that doctrine applies when adjoining land ceases to benefit or be important to grantor upon conveyance of land described in deed); *Cantley*, 143 S.W.2d at 915; *see also Johnson v. Arnold*, 18 S.E. 370, 372 (Ga. 1893) ("In the main, the fee in such property under such detached ownership would be and forever continue unproductive and valueless."). Courts have applied the strip-and-gore doctrine's presumption to mineral interests. *See Escondido Servs.*, 321 S.W.3d at 107–09; *Glover*, 187 S.W.3d at 212–13; *Reagan v. Marathon Oil Co.*, 50 S.W.3d 70, 80–81 (Tex. App.—Waco 2001, no pet.); *Krenek v. Texstar N. Am.*, 787 S.W.2d 566, 568–69 (Tex. App.—Corpus Christi 1990, writ denied); *Lackner v. Bybee*, 159 S.W.2d 215, 216–18 (Tex. Civ. App.—Galveston 1942, writ ref'd w.o.m.).

*Green*, 2018 WL 6565790, at *3.

Crawford does not argue, as did the appellant in *Green*, that the Disputed Tract is a narrow strip in comparison to the adjoining land Mary Ruth conveyed in 1984; instead, he contends that XTO did not, and cannot, prove that the Disputed Tract

10

ceased to be of benefit or importance to Mary Ruth upon her 1984 conveyance[7] because in the 1964 TESCO deed she had retained a conditional, reversionary right to access the surface of the Disputed Tract to develop the oil and gas if she were unable to open a well on other land that would bottom on the Disputed Tract.[8] XTO, on the other hand, claims that Crawford's 1964 surface-access waiver was absolute. Thus, we must construe the 1964 deed to determine the scope of the rights Mary Ruth reserved vis à vis the Disputed Tract. *See, e.g.*, *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (reiterating that construction of unambiguous deed is question of law requiring court to determine parties' intent from deed's four corners and to examine and harmonize the entire instrument so that no provision will be rendered meaningless).

**Analysis**

Whether Mary Ruth's interest in the Disputed Tract remained of any benefit to her after the 1984 conveyance of the adjoining property hinges on whether, in 1984, she retained any ability to access the Disputed Tract for development. Before the

---

[7]Although Crawford cites *Rio Bravo v. Weed*, 50 S.W.2d 1080, 1085 (Tex. 1932), for the proposition that the appurtenance doctrine underlies the requirement that a strip must have ceased to be of benefit or importance to the grantor for the strip-and-gore doctrine to apply, the Texas Supreme Court has distinguished the appurtenance doctrine it relied on in *Rio Bravo* from the strip-and-gore doctrine. *Angelo v. Biscamp*, 441 S.W.2d 524, 526–27 (Tex. 1969); *Escondido Servs., Inc. v. VKM Holdings, LP*, 321 S.W.3d 102, 106–07 (Tex. App.—Eastland 2010, no pet.).

[8]Crawford also argued in the trial court and in his opening brief that the strip-and-gore doctrine cannot apply in the absence of ambiguity in the 1984 deed. But we rejected the same argument in *Green*, handed down after appellant filed his opening brief. 2018 WL 6565790, at *3–5.

advent of widespread, efficient (and profitable) horizontal drilling in the Barnett Shale—in 2002—"[p]ractically speaking, [a] mineral estate would be wholly worthless if the owner of the minerals could not enter upon the land in order to explore for and extract them." *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 788–89 (Tex. 1995); *Green*, 2018 WL 6565790, at *5 & n.13. If Mary Ruth did not retain surface-access rights in the 1964 deed, she had no way to develop the Disputed Tract; therefore, that interest would have ceased to be of practical benefit to her after the 1984 conveyance.[9]

The oil-and-gas reservation in the 1964 deed provides,

> Grantors reserve unto themselves, [and] their heirs and assigns, the right to all oil and gas in and under the [Disputed Tract] but expressly waive all rights of ingress and egress for the purpose of drilling for or

---

[9]Without surface access, the only possible ways for Mary Ruth to develop the oil and gas in 1984 were either via directional drilling from adjacent lands or pooling. *See Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 13–14 (Tex. 2008) (explaining that deviated well, also called a slant well, produces gas from the property on which it is bottomed, which is why such a well is prohibited from bottoming on property not owned by the lessor); *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 634–36 (Tex. App.—Austin 2000, pets. denied) (op. on reh'g) (providing explanation of mechanics and advantages of horizontal drilling); *R.R. Comm'n v. Mack-Hank Petroleum Co.*, 186 S.W.2d 351, 357 (Tex. App.—Austin) (describing directional drilling from adjoining lands), *rev'd on other grounds*, 190 S.W.2d 802 (Tex. 1945); *cf. City of Del Rio v. Clayton Sam Colt Hamilton Tr.*, 269 S.W.3d 613, 617–18 (Tex. App.—San Antonio 2008, pet. denied) (noting that owner of subsurface groundwater who had waived surface access in deed, but who also owned adjoining lands, could access the groundwater through drainage or directional drilling from adjoining lands); 16 Tex. Admin. Code § 3.37(m)(5) (providing that deviated well drilled after April 1, 1949 in violation of state permit is illegal). After Mary Ruth conveyed her adjoining land, directional drilling was an impossibility, and there is no evidence that pooling with other mineral interest owners was a possibility in 1984. *See Green*, 2018 WL 6565790, at *5.

producing oil and/or gas from the surface of the [TESCO Tract] *provided that* wells opened on other lands may be bottomed on the [TESCO Tract].

Crawford argues that the phrase, "provided that wells opened on other lands may be bottomed on" the Disputed Tract means that Mary Ruth waived her right of surface access only if and while she was able to open wells on other lands that could be bottomed on the Disputed Tract. Put another way, he argues that the phrase means that if at any time she could no longer open wells on other lands that could be bottomed on the Disputed Tract, the surface waiver would cease. But XTO argues that the phrase is meant to reinforce the waiver, describing the only means of physical intrusion of the Disputed Tract: via slant drilling from wells that bottom under the Disputed Tract but that do not invade the surface.

Although the proviso "provided that" is not preferred because its meaning can be unclear, "[u]sually, a proviso containing th[os]e words . . . before a sentence or clause[] states an exception to the preceding sentence or clause." *Woods v. VanDevender*, 296 S.W.3d 275, 282 & n.2 (Tex. App.—Beaumont 2009, pet. denied). According to Bryan Garner, "provided that" is disfavored because it "means too many different things." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 727 (3rd ed. 2011). The phrase "may create an exception, a limitation, a condition, or a mere addition," but it sometimes "is the functional equivalent of *if*." *Id.* Both Black's Law Dictionary and Merriam-Webster's give multiple meanings of the word "provided," including the conditional meaning urged by Crawford. Black's defines "provided" as

13

(1) "On the condition or understanding (that)," (2) "Except (that)," and (3) "And." Black's Law Dictionary 1420 (10th ed. 2014). And Merriam-Webster's defines "provided" as "on condition that: with the understanding: if only." Webster's Third New Int'l Dictionary 1827 (2002). Thus, we cannot resolve the parties' intent based on common definitions alone.

However, the parties' intent becomes clearer from reading the 1964 deed in its entirety. As evidenced by the first reservation allowing street and utility access across the TESCO Tract and the covenant that TESCO would not erect fences around the TESCO Tract so long as the adjoining land remained undeveloped for residential purposes, (1) TESCO was concerned about potential public access to—and surface interference with—its electrical towers and (2) the parties contemplated the possibility that Mary Ruth or a subsequent owner might subdivide the adjoining land for residential purposes, thus increasing the possibility of unwanted public access to the towers. To construe the deed to allow streets and utilities on the surface of the Disputed Tract only so long as they were located a certain distance from TESCO's electrical towers—but then to later allow surface access for drilling and exploration at an unknown time, at an unknown state of development of the adjacent property, solely to facilitate the grantor's desire to develop the Disputed Tract—is nonsensical. Nothing indicates that the parties contemplated that TESCO's concern about access

14

around its electrical towers[10] was subordinate to Mary Ruth's ability to develop the Disputed Tract via directional drilling, especially considering the parties' contemplation of future residential development[11] of the surrounding property.[12]

---

[10]*See Howard v. Jackson Elec. Co-op., Inc.*, 430 S.W.2d 689, 690 (Tex. App.—Waco 1968, writ ref'd n.r.e.) (arising from oil driller employee's severe electric shock while repairing truck attached to drilling rig); *see also Bryant v. Gulf Oil Corp.*, 694 S.W.2d 443, 444–45 (Tex. App.—Amarillo 1985, writ ref'd n.r.e.) (arising from electric shock during oil well repair); *Copeland Well Serv., Inc. v. Shell Oil Co.*, 528 S.W.2d 317, 318 (Tex. App.—Tyler 1975, writ dism'd) (bringing wrongful death claim for electrocution while working on oil well); *Tyler v. McDaniel*, 386 S.W.2d 552, 553–54 (Tex. App.—Dallas 1965, writ ref'd n.r.e.) (involving electric shock while working on oil well); *Nance Expl. Co. v. Tex. Emp'rs Ins. Ass'n*, 305 S.W.2d 621, 622 (Tex. App.—El Paso 1957, writ ref'd n.r.e.) (involving electric shock injury occurring during seismic work on premises subject to oil-and-gas lease); *cf. MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 648–49 (Tex. 1999) (involving dispute in which utility company claimed that laying of fiber optic cable around utility poles interfered with poles' lateral support and caused them to lean); *Stephens v. Tex. Elec. Serv. Co.*, 436 S.W.2d 572, 573 (Tex. App.—Eastland 1969, writ ref'd n.r.e.) (arising from electrocution of worker installing goal posts at football stadium); *Montez v. Bailey Cty. Elec. Co-op.*, 397 S.W.2d 108, 109 (Tex. App.—Amarillo 1965, writ ref'd n.r.e.) (arising from personal injuries as a result of electric shock while drilling irrigation water wells).

[11]"From the beginning of municipal regulation of oil and gas drilling operations, municipalities have regularly restricted such operations to non-residential zones." Bruce M. Kramer, *Local Land Use Regulation of Oil and Gas Development*, 2008 No. 1 Rocky Mt. Min. L. Foun.-Inst. Paper No. 5 (2008).

[12]That Mary Ruth would have been entitled to access the Disputed Tract from wells drilled on adjoining land she owned via drainage—but would still have needed TESCO's permission to engage in directional drilling under the TESCO Tract—reinforces this construction of the oil-and-gas reservation: the parties intended that the only permitted physical intrusion of the TESCO Tract to access the Disputed Tract was underneath the surface via a slant well. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 47 (Tex. 2017) ("[T]he surface owner owns and controls the mass of earth undergirding the surface."); *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971) (acknowledging mineral lessee's potential liability for

Accordingly, we conclude that the context of the entire 1964 deed makes clear that Mary Ruth did not intend to waive surface access to the Disputed Tract for only a limited time, depending on her future ability to drill on adjoining lands; instead, the construction of the oil-and-gas reservation in that deed that harmonizes all of its provisions is that Mary Ruth did not intend for her absolute surface waiver for oil-and-gas development and exploration purposes to waive any other right to explore and develop from adjoining lands so long as she owned them. Without the ability to access the Disputed Tract after conveying the adjoining lands, her interest was of little to no practical value until almost twenty years later. *See Green*, 2018 WL 6565790, at *5; *Escondido Servs.*, 321 S.W.3d at 109 ("Having no access to the minerals under the strip after the conveyance . . . , it is reasonable to presume that the Crouches intended to include the strip in the conveyance.").

Crawford raises no additional challenges to the application of the strip-and-gore doctrine.[13] Thus, we hold that the trial court properly determined that the strip-

---

negligently and unnecessarily damaging the subsurface—as well as superadjacent airspace—owned by the surface owner).

[13]As part of his argument regarding construction of the 1964 deed surface waiver, he argues that one of the rights Mary Ruth reserved was the right to hold onto the Disputed Tract for future development. But as we explained in *Green*, once Mary Ruth conveyed the adjacent property in 1984—the time at which we determine the practical benefit to her of the Disputed Tract—she foreclosed the prospect of immediate development; to not apply the presumption on the ground that she retained a "future hope that one day [she] would benefit from that interest, either via pooling or the advent of technology," would go against Texas's public policy that the

16

and-gore presumption applied to Mary Ruth's 1984 conveyance and that Crawford did not raise a fact issue in rebuttal; therefore, the trial court did not err by granting XTO's motion for summary judgment and denying Crawford's motion for partial summary judgment on the same issue. We overrule Crawford's first and dipositive issue.

## Conclusion

Because we have overruled Crawford's dispositive issue, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: December 19, 2019

---

State's natural resources should not only be conserved but developed. *Green*, 2018 WL 6565790, at *5 (citing Tex. Const. art. 16, § 59).